Danny HOBSON, Plaintiff/Appellee,

v.

FIRST STATE BANK, a Banking Corporation, Defendant/Appellant.

Court of Appeals of Tennessee,
Western Section, at Jackson.

April 26, 1989.

Application for Permission to Appeal
Denied by Supreme Court
July 31, 1989.

Charles J. Swayze, Jr. and James Y. Dale, Greenwood, Miss., and G. Hite McLean, Jr., Memphis, for plaintiff/appellee.

James S. Wilder, Sr., Edward B. Johnson, Somerville, and Joel T. Porter, Memphis, for certain class members.

Randall C. Ferguson, Manier, Herod, Hollabaugh & Smith, Nashville, and Walker T. Tipton, Tipton & Tipton, Covington, for defendant/appellant.

TOMLIN, Presiding Judge (Western Section).

Danny Hobson and his class (Plaintiffs) brought this action in the Circuit Court of Tipton County against First State Bank of Covington (Bank). Plaintiffs' class consists of numerous payees on checks drawn on an account with Bank generally known as Flowers Cotton Company (Flowers). The complaint in essence alleged Bank wrongfully returned numerous checks made payable to members of the class on three separate days. More specifically, while Plaintiffs' complaint states Bank "wrongfully dishonored" these checks, the complaint and subsequent pleadings properly describe the nature of Plaintiffs' claim as being one for accountability by Bank after allegedly making final payment.

For identification purposes, the Day One checks consist of those checks received by Bank on January 18, 1985. The Day Two checks consist of those checks received on January 21st. The Day Three checks consist of those received on January 22nd.

The trial court granted Plaintiffs' motion for partial summary judgment as to the Day One checks. After denying Bank's motion for summary judgment as to all checks, the case went to trial as to Day Two and Day Three checks. At the close of all proof, the trial court overruled Bank's motion for a directed verdict and submitted the issue of final payment as to the Day Two and Day Three checks to the jury. As to the Day Three checks, the jury found in Bank's favor. As to the Day Two checks, the jury returned a verdict in favor of Plaintiffs, awarding them damages in the amount of $320,489.87 plus pre-judgment interest. The total amount of the judgment entered by the court on partial summary judgment and the jury verdict was $738,102.95 plus pre-judgment interest. Bank's motions for a new trial, to set aside the verdict, and to alter or amend the verdict were overruled.

Bank on appeal has presented the following issues for our consideration: (1) Did the trial court err as a matter of law in granting Plaintiffs' motion for partial summary judgment as to Day One checks, and at the same time denying Bank's motion for summary judgment as to Day One and Day Two checks? (2) Did the trial court err in overruling Bank's motion for a directed verdict as to Day Two and Day Three checks? (3) Is there any material evidence to support the jury's verdict as to the Day Two checks? (4) Did the trial court abuse its discretion in failing to decertify the payees of the Day Two and Day Three checks from Plaintiffs' class? (5) Whether the cumulative effect of the trial judge's errors was highly prejudicial to the defendant and constituted an abuse of the trial judge's discretion. We find no error and affirm the judgment below.

The basic relevant facts are not in dispute. We will attempt to delineate only those that are material to the issues we are to consider. During the course of several days prior to the period in question—January 18–23, 1985—Flowers issued numerous checks to various payees. The checks were drawn on Flowers' checking account with Bank. The Plaintiffs in the class deposited these checks with their respective banks. The checks were processed through the banking system and ultimately presented to defendant Bank for payment. Bank received the checks from the Federal Reserve Bank in Memphis by courier and from local banks in Covington on three separate days. Bank refused to make payment on the checks in the course of business during this period.

## I. THE "DAY ONE" CHECKS

▪ The gravamen of Plaintiffs' motion for partial summary judgment as to the Day One checks—those received by the

Bank on January 18th and processed on January 21st, the next business day—was to the effect that no genuine issue of any material fact existed, and that as a matter of law Bank had completed its process of posting. Furthermore, at least twice in Bank's brief, referring to the Day One checks, counsel stated that no genuine issue of material fact existed as to Bank's motion for summary judgment at the time Plaintiffs' motion for summary judgment was granted.

The trial judge's order granting partial summary judgment for Plaintiffs makes the basis for his ruling quite clear:

> The Court has concluded that no genuine material issue of fact exists but that the Defendant Bank completed the process of posting pursuant to Section 47–4–213, Tennessee Code Annotated, and that final payment was made for the checks presented to the Defendant Bank on January 18th, and returned to the bank for processing on January 21st. The Court further concluded that no genuine material issue of fact exists that the Defendant Bank charged the account of Flowers Deverell and Crawford Cotton Company with the checks presented by Plaintiff and his class at the conclusion of the business day of January 21, 1985, and that further, the computer entries made by the Defendant Bank were not reversed at the conclusion of the business day of January 21, 1985. The Court further concluded that no genuine material issue of fact exists but that the bank did not reverse its computer entries prior to the midnight deadline on January 21, 1985. Construing the language of Section 47–4–213, the Court concludes, as a matter of law, that the Defendant Bank finally paid those checks presented by Plaintiff and his class on January 18, 1985, and returned to the bank on January 21, 1985, as a matter of law.

It is readily agreed that what happened in regard to Day One checks was as follows: On Friday, January 18, 1985, Bank received thirty-two checks drawn on Flowers' account totaling $427,366.57. Most of the checks arrived from the Federal Reserve clearing house in Memphis that morning, while others arrived from local banks in Covington that afternoon. During the day Bank processed Flowers' checks along with all other checks it received that day. The checks were inserted in a reader-sorter that reads the account number, the trancode, whether to debit or credit the account, and separates the checks by account numbers. At the end of the day the checks were sorted six more times. After everything was completed at the Bank, this information was transmitted by wire to Financial Data Services, a computer center located in Brownsville the night of the 18th. The checks were then fine-sorted by account number, placed in a tray and locked in a fireproof cabinet to await further processing the next business day. During the night, the computer center processed the transmitted information.

One of the principal effects of the transmission of this information to Brownsville is the actual crediting or debiting of a customer's account. Flowers checks were encoded "999999," preceded by the code "3." This instructed the computer at Brownsville to debit the Flowers account for the total amount of all checks regardless of whether it created an overdraft or a negative balance. Unless Bank specially requested and obtained a printout of a customer's account that evening, Bank would not know until the following business day the effect the checks had on a particular account.

Early on Monday morning the checks in house at the Bank, including the checks in question, were removed from the tray, microfilmed, dated and stamped "paid." If an account actually was in overdraft, it was already in such a status at the time this filming was done. Up to this point, all checks were handled the same way, whether they caused an overdraft or not.

Later that morning, Bank received a report from the computer center, showing what accounts were placed in overdraft. The report indicated that the checks drawn on Flowers' account would create an overdraft status in the account. The report also listed those checks creating an over-

draft that might be paid and those checks which were considered "no pay." As to the latter class, overdraft notices were also printed and sent to Bank.

Flower's checks and the overdraft notices and checks for the other overdrawn accounts were then taken to a Bank officer for examination for an ultimate decision of whether to pay or not to pay. Officers of Bank mulled over the decision of whether to pay or not to pay the Flowers' checks of the 18th for most of the day Monday. As a matter of fact, the decision not to pay was not made until between 8:00 and 9:00 p.m. the evening of the 21st. By this time the local banks had closed. This prevented Bank from returning the checks received locally, forcing them to be honored.

The decision not to pay the Flowers' checks of the 18th was in fact not made until after the Bank's regular transmission to Brownsville and business conducted on the 21st was terminated. Mary Jane Tankersley, who served as the item processor in Bank's bookkeeping department in January, 1985, testified that up until the time of the transmission to Brownsville on the night of the 21st, no one had told her to reject the Flowers' checks or to show their return in the transmission. Neither was she asked to delay the transmission on the 21st until a decision was made about the Flowers' checks of the 18th.

After the Bank's transmission to Brownsville the night of the 21st, if Bank had decided to pay the Federal Reserve checks, nothing further would have had to be done except to file and send them out with the Bank statements, as the accounts had already been debited. The filing of checks in the customer's jacket was simply a clerical, ministerial act and played no part in the decision to pay or not to pay. In an attempt to carry out a decision of non-payment, two Bank officers personally returned the Day One checks to the Memphis branch of the Federal Reserve at 10:30 p.m. the night of the 21st. It also should be noted that the actual reversing entries for the Day One checks were not transmitted until the next day—the 22nd.

Bank deposits and collections are governed by Chapter 4 of Tennessee Code Annotated, codified at sections 47-4-101, et seq. The issue with which we are confronted is whether or not the Bank had completed "the process of posting" so as to become liable as the payor of these checks. T.C.A. § 47-4-109 defines "process of posting" as follows:

**47–4–109. Process of posting.**—The "process of posting" means the usual procedure followed by a payor bank in determining to pay an item and in recording the payment, including one or more of the following or other steps as determined by the bank:

(a) verification of any signature;

(b) ascertaining that sufficient funds are available;

(c) affixing a "paid" or other stamp;

(d) entering a charge or entry to a customer's account;

(e) correcting or reversing an entry or erroneous action with respect to an item.

Plaintiffs contend that Bank had made final payment on the checks in question by completing the process of posting and is thus accountable under T.C.A. § 47-4-213(1)(c). Section 47-4-213(1) in effect at the time this transaction took place read in its entirety as follows:

**47–4–213. Final payment of item by payor bank—When provisional debits and credits become final—When certain credits become available for withdrawal.**—(1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

(a) paid the item in cash; or

(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or

(c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or[1]

**1.** Apparently as a result of this litigation, the General Assembly in 1988 amended Section 47–4–213(1) by deleting therefrom sub-section (c), thereby eliminating the completion of the pro-

(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

Upon a final payment under subparagraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item.

The Bank produced its "usual procedure" for posting checks in an answer to interrogatories and request for admissions. It reads in detail as follows:

FIRST STATE BANK ITEM PROCESSING SYSTEM

A) Check/deposit is presented to teller/clerk for deposit for cashing by person or through the mail.

B) Checks are presented from other two Covington banks.

C) Checks from out of town are delived [sic] by courier by the Memphis Branch of the Federal Reserve Bank.

PROCESSING OF ITEMS

1. Checks/deposits/and other items are received by the proof department where they are balanced and encoded and put into batches with headers.

2. Checks/deposits/and other items are processed by the NCR reader/sorter which reads and captures to computer disc all magnetic fields that have been encoded at the bottom of each item—such as transit number, check number, transaction codes, float data and amount.

3. All corrections are made for any misreads of this magnetic data by an operator of the NCR mini-vips system (by means of CRT screen/keyboard).

4. All data on the computer disc that has been captured and balanced is then scrubbed by the computer system in preparation for transmission to Financial Data Services, Inc. in Brownsville, Tennessee.

5. Our mini-vips operator calls Brownsville and informs the computer center that we are now ready to send today's work. This usually happens between 6:00 p.m. and 7:00 p.m. If our send agrees with their receipt, we are balanced on the items processed and we sign off of the phone transmission. We then put our items away in a fireproof case awaiting future processing the following work day.

6. That night the computer center processes all of the items that we have just sent to them, along with the items of several other banks. They balance our items and print reports for us on their printer.

7. The following work day, after transmitting our items to Brownsville, we receive all of our reports from the computer center. These include:

REPORTS & TICKETS & NOTICES & STATEMENTS & TRIAL BALANCES

8. We microfilm all reports and checks from the previous work day. The reports are filmed by a roto-line microfilmer and the other items are microfilmed by a microimager that prints "paid" on the front of the items.

9. The bookkeepers pull all notices printed by the computer on checks that would overdraw an account. These notices and/or checks are taken to an executive officer of the bank, usually James Q. Edmonds or Jerry DuPriest.

10. The officers decide which checks are to be paid and which will be returned. All checks creating an overdraft have to be approved by an executive officer as a loan. No officers have authority to approve an overdraft in eexcess [sic] of $100,000.00. If this occurs, the customer can cover before the close of business that work day and not be considered overdrawn—will still show on our records.

11. If no decision is made to pay, we have until midnight of that day to return. We have to call on all items of over $2500.00 the last person endorsing.

12. If a check is returned for insufficient funds, one of the following stamps is to be stamped on the check:
1) "Not" in front of "paid"

cess of posting as a means of determining when an item is finally paid by a payor bank.

2) "Insufficient funds" stamp

13. After the decision is made to pay or not pay, the checks are handled as follows:

14. 1) Individual checks (non business) are put away in bunches by cycle date.
2) Business checks are filed in individual folders.

15. All return checks are:
1) Charged back to our customers.
2) Sent back through local clearing arrangement.
3) Mailed, sent by courier, or hand carried to Federal Reserve Bank in Memphis.

16. All checks returned are sent back to the last endorser. The persons involved are those which have been delineated in paragraph 5 above with the exception of the President of the bank, Theodore B. Sloan and the addition of James Q. Edmonds, Vice President.

An officer of Bank as well as bookkeeper Tankersley testified that after the data was transmitted to the computer center, the books were considered closed for the day, and that Bank had never returned a check after the transmission of the day's computer data. A Bank officer further admitted that the personal return of Day One checks to the Federal Reserve branch in Memphis at 10:30 p.m. on the night of the 21st was not a part of its "usual procedure." Its bookkeepers testified that Bank's usual procedure for processing returned checks involved the transmitting of a reversing entry the day after Bank received the check, which in this case would have been January 21st. This was not done.

■ Bank contends that T.C.A. § 47–4–301 granted it until midnight of the 21st to return the checks so as not to be in a position of having made final payment. In support of this position, Bank relies upon the case of *Yeiser v. Bank of Adamsville*, 614 S.W.2d 338 (Tenn.1981). Bank's reliance upon *Yeiser* is misplaced, for in *Yeiser* the Supreme Court analyzed final payment exclusively under T.C.A. § 47–4–213(1)(d). T.C.A. § 47–4–301 states that a bank may revoke settlement by returning the check before its midnight dead-line. T.C.A. § 47–4–104(h) defines "midnight deadline" as "midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." The *Yeiser* court said "A fortiori, when a payor bank returns a 'not good' check before its 'midnight deadline,' it has not made final payment, as contemplated in § 4–213, and the accountability provision of § 4–302 is not applicable." *Id.* at 343.

On the other hand, it should be noted that § 47–4–213(1) expressly states that final payment occurs on the happening of any of the listed events "whichever happens first." Clearly, the Legislature in enacting § 47–4–213 contemplated a situation in which the process of posting could be completed under sub-sections (a) through (c) before attempting to revoke a provisional settlement under sub-section (d). The *Yeiser* court stated: " 'Where a bank does not act affirmatively under subsections (a) to (c), inaction, the failure to revoke a provisional settlement, constitutes final payment under subsection (d) of section 4–213(1).' " *Id.* at 342 (quoting *Colorado National Bank v. First National Bank & Trust Co.*, 459 F.Supp. 1366, 1368–69 (W.D. Mich.1978)).

Conversely, under the "whichever happens first" language, if a bank had completed affirmative action under subsection (c) of § 47–4–213, final payment would have been accomplished regardless of any action attempted by the bank under subsection (d).

A case very much in point is *H. Schultz & Sons, Inc. v. Bank of Suffolk County*, 439 F.Supp. 1137 (E.D.N.Y.1977). In *Schultz*, plaintiff sued Bank on a $40,000 check drawn by a customer who maintained an account at the defendant bank. Plaintiff alleged the bank wrongfully dishonored the check after it learned of the customer's bankruptcy. The parties stipulated that the check was drawn by the bank's customer on its account, payable to plaintiff and that plaintiff deposited the check for collection in its account at its bank, which forwarded the check to the Federal Reserve

Bank in New York, which in turn forwarded the check to defendant. The bank received the check on November 29, 1973. On the same day the check was photographed, "proven," and debited to the customer's account. On the following day the bank learned of the customer's bankruptcy and on that same day gave telephone notice of dishonor to the Fed. If the bank had not learned of the customer's bankruptcy, no additional processing of the check would have taken place other than sending it out in the customer's monthly statement. Both parties filed motions for summary judgment. Plaintiff contended that final payment had been made so that subsequent notice of bankruptcy was ineffective to prevent plaintiff's recovery. The bank contended that final payment had not occurred and could not occur until expiration of the maximum time permitted for returning the check—midnight of the day following receipt of the check—or midnight of November 30, 1973.

As in the case before us, the parties disagreed as to whether Bank's "process of posting" was completed. There, as here, a question of law was presented as to the proper interpretation of § 4–109 of the U.C.C., which contains the same language in both the Tennessee and New York Codes. The bank contended that because of the language in subsection (e), it retained discretion to reverse an entry on a customer's account, and that it could properly do so anytime up until the "midnight deadline," even though the "process of posting" might have been otherwise accomplished. Plaintiff's interpretation of subsection (e) would permit the "correcting or reversing of an entry or erroneous action" only in the event that an error had been made, whether in decision making or mechanical recording, and would not authorize the correcting or reversing of an entry merely upon the acquisition of additional information of which the Bank was not aware prior to the completion of the other elements in the process of posting. It might be noted that in the case under consideration Bank contends the process of posting could not be completed until the

expiration of the midnight deadline, witness the fact that Bank relies upon its delivery of the checks to the Federal Reserve in Memphis just prior to the midnight deadline, as the key factor preventing "final payment" from taking place.

The *Schultz* court acknowledged that the much criticized opinion in *West Side Bank v. Marine National Exchange Bank*, 37 Wis.2d 661, 155 N.W.2d 587 (1968),[2] supported the defendant bank's interpretation of sub-section (e). However, the *Schultz* court adopted an opposite position. In granting plaintiff's motion for summary judgment, the court quoted at length from a Law Review note entitled *Bank Procedures And The U.C.C.—When Is A Check Finally Paid?*, 9 B.C. Indus. & Com.L.Rev. 1957–58 (1968), noting the following passage as reflecting the importance of the concept of "final payment" in the banking section of the U.C.C.:

> The concept of final payment is central to the scheme of Article 4 because the time of final payment of a check or similar item is the starting point for determining the rights and obligations of a number of parties in relation to an item. When final payment occurs, the payor bank is deemed to be accountable to the presenting party for the amount of the item. At the same time the drawer of the instrument is relieved of liability to the holder because the amount is deemed to have been paid. . . . Final payment, furthermore, is one of the occurrences which can prevent the "four legals"—notice, stop-order, legal process and set-off—from being effective to prevent actual payment of the item. . . . Final payment, moreover, marks the end of the collection process and the beginning of the remitting process, whereby the amount of the item is returned to the party demanding payment.

*Schultz*, 439 F.Supp. at 1139–40.

The *Schultz* court concluded:

> [O]nce all steps have been taken the "process of posting" is then deemed by the statute to be complete. Moreover, the Bank's right to return the checks

---

**2.** Bank relies upon *West Side* in the case at bar.

unpaid is subject to two conditions: (1) that it has not "made final payment," i.e., "completed the process of posting," and (2) that the midnight deadline has not passed. The failure of either condition would defeat the Bank's right to return the check.

*Id.* at 1140. *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Devon Bank,* 832 F.2d 1005 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1473, 99 L.Ed.2d 702 (1988); *Nelson v. Platte Valley State Bank & Trust Co.,* 805 F.2d 332 (8th Cir.1986); *North Carolina National Bank v. South Carolina National Bank,* 449 F.Supp. 616 (D.S.C.1976), *aff.,* 573 F.2d 1305 (4th Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978); *Hoag v. Valley National Bank,* 147 Ariz. 137, 708 P.2d 1328 (App.1985).

In *Reflections on West Side Bank: A Draftsman's View,* 18 Cath.U.L.Rev. 23, 32 (1968), Walter D. Malcolm, who drafted Section 4 of the UCC, states: "If the result reached in *West Side* had been intended, then the only logical thing to do would have been to delete paragraph (c) of Section 4–213(1) and paragraph (d) of Section 4–303(1)."

In addition, Comment 3 to Section 47–4–109, Process of Posting, contains an example of common banking procedures in the computer age that is analogous to the case at bar:

> Example 3. A payor bank receives in the mail on Monday an item drawn upon it. The item is sorted and otherwise processed on Monday and during Monday night is provisionally recorded on tape by an electronic computer as charged to the customer's account. On Tuesday a clerk examines the signature on the item and makes other checks to determine finally whether the item should be paid. If the clerk determines the signature is valid and makes a decision to pay and all processing of this item is complete, e.g., at 12 noon on Tuesday, the "process of posting" is completed at that time. If, however, the clerk determines the signature is not valid or that the item should not be paid for some other reason, the item is returned to the presenting bank and in the regular Tuesday night run of the computer the debit to the customer's account for the item is reversed or an off-setting credit entry is made. In this case, as in Example 2, there has been no determination to pay the item, no completion of the process of posting and no payment of the item.

The drafters of the UCC obviously contemplated a situation in which the process of posting could be completed before the midnight deadline. The transmission of reversing or offsetting entries to a customer's account on the next banking day after the receipt of the check as a part of the process of posting was also clearly within their contemplation. As noted in White & Summers, *UCC* § 16–4, p. 536, "In such a case a bank official typically ... has the entry reversed in the first computer run." Bank admittedly did not do this. Under these facts Bank had completed the process of posting the Day One checks with the data transmission to the computer center of January 21st.

■ Nonetheless, Bank maintains that the process had not been completed because no employee verified the signatures on the checks or put the checks in the customer's file folders. White & Summers has a fitting response to this contention:

> Note that the process of posting need not include all of (a) through (e) [§ 4–109] but only "one or more of the following ... as determined by the bank." Thus, if the bank never verifies any signature, it may have completed the process of posting despite the fact that it failed to verify the signature on the check in question. In each case a lawyer arguing that a bank has or has not made final payment must examine that bank's normal business behavior to determine whether the "steps as determined by the bank" had been taken.

*Id.* § 16–4, p. 535.

The check processing procedure of Bank does not include the verification of signatures. As to the Bank's contention that its failure to file the checks in the individual account folders would preclude the comple-

tion of the process of posting, Bank's president testified that its employees put the checks into the folders whenever they got around to it or had the time. There was testimony to the effect that many times the checks would remain stacked on top of the cabinets on busy days overnight and would not be filed until the next day. As to this particular step, White & Summers observes, "Placing the check in the depositor's file (assuming that it is not part of the signature checking process) and stamping the check paid are clerical operations and we see no reason why one should have to do all of them to have posting." *Id.* § 16–4, p. 536.

Accordingly, we are of the opinion that the trial court did not err in granting Plaintiffs' motion for partial summary judgment as to Day One checks.

## II. THE "DAY TWO" CHECKS

As to the Day Two checks, Bank contends the trial court erred first in overruling its earlier motion for summary judgment and then later at trial in overruling its motion for a directed verdict. When the trial court's denial of a motion for summary judgment is predicated upon the existence of a genuine issue as to a material fact, the overruling of that motion is not reviewable on appeal when subsequently there has been a judgment rendered after a trial on the merits. *Mullins v. Precision Rubber Products*, 671 S.W.2d 496, 498 (Tenn.App.1984); *Tate v. County of Monroe*, 578 S.W.2d 642, 644 (Tenn.App.1978).

When a jury verdict has been approved by the trial court, the scope of our review on appeal is limited to whether or not the record contains any material evidence to support the jury's verdict. Rule 13(d), T.R.A.P. Under this scope of review, this Court must take the strongest legitimate view of all the evidence to uphold the verdict, assume the truth of all that tends to support it, discard all to the contrary, and allow all reasonable inferences to sustain the verdict. *Moore v. Bailey*, 628 S.W.2d 431, 433 (Tenn.App.1981). Even if this Court might have reached a different conclusion from that reached by the jury, if there is any material evidence to support the verdict, the judgment must be af-

firmed. *Goodman v. Balthrop Construction Co.*, 626 S.W.2d 21, 24 (Tenn.App. 1981). From an examination of this lengthy record, we are of the opinion there was material evidence introduced at trial to support the jury's verdict that there had been a decision by Bank to pay the Day Two checks.

Flowers' account was set up by Bank to provide for the payment of all its checks regardless of amount and whether or not it created a negative balance or overdraft, by the placing of a Code "3" and "999999" on the checks as they were processed. Furthermore, Flowers' bank statement revealed that the checks were posted to the Flowers' account and that the account was thereby overdrawn. There was evidence that on previous occasions Flowers' account maintained a negative balance, but the checks creating that negative balance were paid by the Bank in overdraft.

In addition, Bank determined the amount of funds that would have been available to pay the Day Two checks before carrying out an act of set-off by examining the printout on Tuesday, January 22nd. Flowers' bank statement for that day revealed that there were some funds available to pay Day Two checks, but those funds were taken by Bank to be applied to certain loans.

There was also testimony to the effect that Bank had Day Two checks in its possession as of 6:00 on January 21st following their processing in due course of business. Nonetheless, Bank did not return the processed Day Two checks to the Fed in Memphis at the same time it returned the Day One checks at 10:30 p.m. on Monday, January 21st.

There was testimony to the effect that in the event Bank made a determination to reject or not to pay an item, it would print and mail out a rejection slip. Bank did not and could not produce any rejection slips relating to Flowers' Day Two checks. Without setting forth other evidence supporting this verdict, this Court is of the opinion that what has been recited above is sufficient for us to declare that there was material evidence to support the jury's verdict.

## III. CLASS DECERTIFICATION

■ On appeal, Bank has contended that the trial court abused its discretion in failing to decertify the Day Two and Day Three checks from Plaintiffs' class after granting partial summary judgment as to the Day One checks. In support of this position, Bank contends that the granting of the summary judgment for the Day One checks should have put the court on notice that there was a different factual basis for the Day Two and Day Three checks than the Day One checks.

We can find nothing in the record to indicate that at any time during trial Bank requested decertification of Plaintiffs' class in this matter. Furthermore, Bank failed to raise this issue in its motion for a new trial. Rule 3(e), T.R.A.P., precludes appellate consideration of issues in jury cases not specifically presented to the trial court by means of a motion for a new trial. Accordingly, we consider this issue as having been waived and it will not be considered.

The fifth and final issue of Bank is presented in a shotgun manner: "Whether the cumulative effect of the trial judge's errors was highly prejudicial to the defendant and constituted an abuse of the trial judge's discretion?" No further description or definition of these errors is stated except in the latter pages of the Argument section of defendant's brief. This Court has reviewed these alleged errors and finds that they do not constitute an abuse of the trial court's discretion. In the event any one or more of them might be considered error, we consider them to be harmless error.

For the reasons herein stated, the trial court's judgment is affirmed in all respects. Costs in this cause on appeal are taxed to Bank, for which execution may issue if necessary.

HIGHERS and FARMER, JJ., concur.