**UNITED BANK OF CRETE–STEGER, Plaintiff–Appellant,**

v.

**GAINER BANK, N.A., Defendant–Appellee.**

**No. 88–2231.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1989.

Decided May 11, 1989.

Robert D. Kreisman, Kreisman & Rakich, Chicago, Ill., for plaintiff-appellant.

Kathryn D. Schmidt, Burke Murphy Costanza & Cuppy, Merrillville, Ind., for defendant-appellee.

Before CUDAHY, COFFEY, and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff United Bank of Crete–Steger ("Crete–Steger") appeals the order of the United States District Court for the Northern District of Indiana granting summary judgment for the defendant, Gainer Bank, N.A. ("Gainer"), finding that because Saturday, June 23, 1984, could not be considered as a "banking day" under Ind.Code § 26–1–4–104(1)(c), Gainer provided Crete–Steger with timely notice of its decision to dishonor a check. We affirm.

I.

The facts are not in dispute. On Thursday, June 21, 1984, Gentry Metals, Inc. ("Gentry"), issued a check for $142,300, drawn on its account at Gainer and made payable to John Zwick. Later that day Zwick deposited the check in his account at the United Bank of Crete–Steger. Crete–Steger forwarded the check through the routine banking channels for collection to the Federal Reserve Bank of Chicago, which in turn forwarded the check to Gainer. Gainer received the check on Friday, June 22.[1] Although Gainer's main facility and all of its branches were open during the morning hours of Saturday, June 23, Gainer did not process the check until Monday, June 25. Upon checking their records, Gainer determined that Gentry had insufficient funds in its account to cover the $142,300 draft, dishonored the check and immediately notified Crete–Steger. Prior to receiving Gainer's notice of dishonor, Crete–Steger credited Zwick's account with $142,300 and Zwick withdrew the funds.

Crete–Steger commenced this action in the district court on May 2, 1985, alleging that Gainer failed to give timely notice of its decision to dishonor Gentry's check as required under Ind.Code § 26–1–4–301(1)[2]—Indiana's codification of the Uniform Commercial Code—and was thus strictly liable to Crete–Steger under Ind.Code § 26–1–4–302[3] for the face

---

**1.** Unless otherwise indicated, the events referred to herein took place in 1984.

**2.** Ind.Code § 26–1–4–301(1) reads:
"Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt, the payor bank may revoke the settlement and recover any payment if before it has made final payment ... and before its midnight deadline it:
(a) Returns the item; or

(b) Sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return."

**3.** Ind.Code § 26–1–4–302 reads:
"In the absence of a valid defense such as breach of a presentment warranty, settlement effected, or the like, if an item is presented on and received by a payor bank, the bank is accountable for the amount of:
(a) A demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without

amount of the check.[4] Crete–Steger alleged that Gainer should have given notice on Saturday, June 23, rather than on Monday, June 25, because Gainer was open to the public, albeit for restricted hours and limited banking services on that Saturday.

On October 16, 1986, Crete–Steger filed a motion for summary judgment arguing that it was entitled to judgment as a matter of law because Gainer failed to give notice of its decision to dishonor Gentry's check prior to midnight on Saturday, June 23. Gainer filed a cross-motion for summary judgment on November 5, 1986, arguing that Saturday, June 23, was not a "banking day" and thus, Gainer was not required to give notice of dishonor until Monday, June 25. On June 1, 1988, the district court granted Gainer's motion for summary judgment and denied Crete–Steger's motion. The district court found that because Saturday, June 23, was not a "banking day" for Gainer, Gainer's notice of dishonor on Monday, June 25, was timely. On appeal Crete–Steger alleges that the district court misapplied the substantive law applicable on the question of whether Saturday, June 23, 1984, was a "banking day" under Ind. Code § 26–1–4–104(1)(c), and thus committed error in granting Gainer's summary judgment motion.

## II.

Rule 56(c) of the Federal Rules of Civil Procedure allows the granting of a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The facts of this case are not in dispute. Thus, "our inquiry is limited to determining whether

the district court erred in concluding that [Gainer] is entitled to judgment as a matter of law. Our review is *de novo.*" *Commercial Union Insurance Co. v. Ramada Hotel Operating Co.,* 852 F.2d 298, 300 (7th Cir.1988).

Section 26–1–4–301(1) of the Indiana Code requires that a payor bank either pay or notify a collecting bank of its decision to dishonor a check before the midnight deadline following the payor bank's receipt of the item. "Midnight deadline" is defined as "midnight on [the payor bank's] next banking day following the banking day on which it receives the relevant item...." Ind.Code § 26–1–4–104(1)(h). Gainer received Gentry's check on Friday, June 22. Thus, under sections 4–301(1) and 4–104(1)(h) Gainer had until midnight of the next banking day following Friday, June 22, to notify Crete–Steger of its decision to dishonor Gentry's check. "Banking day" is defined as "that part of any day on which a bank is open to the public *for carrying on substantially all of its banking functions.*" Ind.Code § 26–1–4–104(1)(c) (emphasis added).

The sole dispute between the parties to this lawsuit is whether Saturday, June 23, was a "banking day" for Gainer. If it was, as Crete–Steger contends, then Gainer's notice of dishonor on Monday, June 25, was untimely and Gainer would be strictly liable for Crete–Steger's loss on the check. On the other hand, if Gainer's assertion that Saturday, June 23, was not a full "banking day" under the Code is proper, then Gainer's notice of dishonor was given within the midnight deadline of its next banking day—Monday, June 25—and Crete–Steger must look to the other parties involved in the transaction in its attempt to recover the loss on Gentry's check.

Whether Saturday, June 23, was a "banking day" depends on whether Gainer

---

settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

(b) Any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents."

**4.** After filing this action, Crete–Steger entered into an indemnity agreement with Zwick based on a balance of $80,000 in Zwick's account at Crete–Steger. The parties have agreed that this sum will be credited against Crete–Steger's claim of $142,300 against Gainer. Thus, the amount in controversy in this action is $62,300.

was "open to the public for carrying on substantially all of its banking functions." It is undisputed that Gainer's main office and all of its branches were open only for limited banking services during the morning hours on Saturday, June 23. During these hours Gainer's customers could cash checks, make deposits and withdrawals, purchase cashier's checks and money orders, open new accounts, and fill out loan applications. Many of Gainer's departments, including but not limited to the installment loan department, the commercial loan department and the bookkeeping department, were closed on Saturday, June 23. Thus, the relevant inquiry is whether the limited services Gainer Bank offered on Saturday, June 23, comprised "substantially all of its banking functions."

This court was recently confronted with interpreting the phrase "substantially all of its banking functions" in *Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Devon Bank,* 832 F.2d 1005 (7th Cir.1987).[5] The plaintiff in *Merrill Lynch* argued that because the defendant bank maintained walk-up windows for customers to make deposits and withdrawals, processed checks, and made inter-bank loans on the day in dispute, that day was a "banking day" under § 4–104(1)(c). In considering the plaintiff's argument, we referred to the definition of "bank" in the Bank Holding Company Act and concluded that in order to "carry[ ] on substantially all of its banking functions," a bank must be open to the public for both accepting deposits and withdrawals *and* making loans, because "[m]aking loans is a necessary part of 'banking.'" *Id.* at 1006–07.[6] The Devon bank was not open on the disputed day for opening accounts, arrang-

ing loans, or drawing down lines of credit. *Id.* at 1006. Thus, in the *Merrill Lynch* case, we held that the day in question was not a "banking day" as that term is defined in § 4–104(1)(c) based on our conclusion that the limited activities Devon offered on that day were insufficient to deem the bank " 'open to the public' for 'substantially all of its banking functions.' " *Id.*

On Saturday, June 23, Gainer listed its main facility and branches as being open for "limited service." These services included: check cashing; acceptance of demand deposits; acceptance of savings and certificate deposits; acceptance of signature cards for opening new accounts; acceptance of loan applications; and selling cashier's checks and money orders. Further, bank managers who were present on Saturday had the authority to pay out on a customer account and the discretion to issue a cashier's check based on uncollected funds that were deposited in a customer's account.

Crete–Steger argues that because Gainer's customers could make deposits and withdrawals, as well as fill out loan applications, Gainer was "open to the public for carrying on substantially all of its banking functions." In advancing this position, Crete–Steger misconstrues the bank's offering of a restricted number of banking activities on Saturday, June 23, to its own benefit as being full banking, when in reality it is in sharp contrast with the amount of banking activity Gainer normally conducted Monday through Friday. Thus, Crete–Steger improperly attempts to equate a "business day" with a "banking day"—two terms the Official Comment to

---

**5.** Although the law of Indiana controls the present case, our interpretation in *Merrill Lynch* of Illinois' codification of § 4–104(1)(c), *see* Ill. Rev.Stat. ch. 26 ¶ 4–104(1)(c), is persuasive in determining the construction to be given the same section as enacted in Indiana. In order to promote the objective of uniformity stated in § 1–102 of the Uniform Commercial Code, it is appropriate, if not mandated, that a court refer to decisions of other jurisdictions interpreting the same provision. *See M & K Corp. v. Farmers State Bank,* 496 N.E.2d 111 (Ind.Ct.App. 1986); *Helvey v. Wabash County REMC,* 151

Ind.App. 176, 278 N.E.2d 608 (1972). *See generally* 1 R. Anderson, Anderson on the Uniform Commercial Code § 1–102:43 (3d ed. 1984 and Supp.1988).

**6.** 12 U.S.C. § 1841(c)(1)(B) defines a "bank" as "[a]n institution ... which both (i) accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others; and (ii) is engaged in the business of making commercial loans."

§ 4–104 explicitly distinguishes.[7]

Although Gainer accepted deposits and allowed withdrawals on Saturdays, these transactions were neither dated nor posted on the ledger until the following Monday.[8] Thus, Gainer's customers did not earn interest on Saturday deposits until the following Monday. In addition, despite the fact that a customer could execute a signature card for a new account on Saturday, the bank had a practice of not opening an account (thus not considering the account operative) until the following Monday; as a result, no interest accrued on opening deposits in these accounts until Monday.

The only loan services Gainer regularly offered on Saturday was the acceptance of loan applications. These applications were not acted upon, thus neither approved nor denied, until the following week except under special circumstances. Although it was possible to close a consumer loan on Saturday, special arrangements had to be made with Gainer in advance. We are cognizant of the fact that this court in *Merrill Lynch* relied on the fact that the defendant bank in that case performed no customer-related loan activities. 832 F.2d at 1006–07. Nonetheless, it is illogical to conclude that accepting loan applications to be processed the following week and allowing consumer loans to be closed under special circumstances comprised substantially all of Gainer's loan activities. Indeed, Gainer's installment, real estate and commercial loan departments were closed to the public on Saturday, June 23.

Also closed on Saturday, June 23, were the trust department, the personnel department, the comptroller's department, the auditing department, the marketing department, the wire transfer department, the investment department, the executive offices, and branch administration. Other than the lobby areas in Gainer's main facility and branches, the only departments open on that Saturday were the account statement department and the proof department. Five persons worked in the account statement department and four individuals worked in the proof department where deposits were received, deposit tickets were verified and the totals were entered into the bank's computer. Irrespective of the fact that a skeletal crew operated in these two departments on Saturday, June 23, it is important to note that by far the vast majority of Gainer's other departments were closed to the public on Saturday, June 23. In *Security Bank and Trust Co. v. Federal National Bank and Trust Co.*, 554 P.2d 119, 122 (Okla.Ct.App. 1976), the court held that a given day was not a "banking day" under § 4–104(1)(c) based on the fact that many of the defendant bank's departments were closed on the day in dispute.

Finally, the following services were not available on Saturdays: the sale of government bonds; the sale of traveler's checks; and access to safety deposit boxes. Gainer offered all of these services during regular banking hours Monday through Friday.

**7.** The Official Comment to § 4–104 reads in pertinent part:

"Under [the definition of 'banking day'] that part of a *business day* when a bank is open to the public for *limited functions*, e.g., on Saturday evenings to receive deposits and cash checks, but with loan, bookkeeping and other departments closed, is not part of a *banking day.*"

The Official Comments to the Uniform Commercial Code were not adopted by the Indiana legislature when it enacted the Code. Nonetheless, the Indiana courts view the Comments as persuasive authority in interpreting the provisions of the Code. *See, e.g., First Nat'l Bank v. Smoker*, 153 Ind.App. 71, 286 N.E.2d 203 (1972). Thus, the Code drafters' distinction between "business day" and "banking day" is relevant to the question of whether Saturday, June 23, was a "banking day" for Gainer.

**8.** These transactions were neither dated nor posted on Saturday because Gainer's bookkeeping department was closed. We note the fact that the bookkeeping department was closed only in the context that it was one of the many departments in the bank closed on Saturday, June 23. We emphasize that a bank may not close the bookkeeping department, or any other single bank department, to avoid coming within the parameters of the definition of "banking day" in § 4–104(1)(c) on a day when the bank offers a majority of its services to the public. It is the totality of functions offered to the public that is significant to the determination of whether a given day is a "banking day" under the Code. *See supra* note 7.

Simply stated, the services that Gainer offered on Saturday, June 23, included only minimal customer contact operations. The majority of the transactions conducted on that day were not processed until the following Monday. Furthermore, the vast majority of Gainer's departments were closed. The departments that were open conducted only limited functions, which even in their totality are insufficient to justify a conclusion that Gainer was "carrying on substantially all of its banking functions" on the day in question. Accordingly, we hold that Saturday, June 23, 1984, was not a "banking day" for Gainer Bank, N.A., under the definition of that term in section 26–1–4–104(1)(c) of the Indiana Code.

Summary judgment is appropriate in this matter. As we recently stated in *Merrill Lynch:*

"It would unacceptably disrupt commercial relations to put to a jury, case by case, the question whether a given day was a 'banking day.' Billions of dollars in transactions must be processed by every midnight deadline, and everyone has an interest in having this time defined with precision."

832 F.2d at 1007. In view of our holding that Saturday, June 23, 1984, was not a "banking day" for Gainer, Gainer's notice to Crete–Steger of its decision to dishonor Gentry's check was timely under Ind.Code §§ 26–1–4–301(1) and 26–1–4–104(1)(h). Gainer notified Crete–Steger of its decision before midnight on Gainer's next banking day, Monday, June 25, 1984, following the banking day it received Gentry's check for collection, Friday, June 22, 1984. The district court's grant of summary judgment in favor of Gainer is

AFFIRMED.