IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 23, 2017 Session

## BRITTANY NICOLE VANDYKE v. BROOKE E. FOULK, M.D., ET AL.

### Appeal from the Circuit Court for Washington County
No. 30591      Jean A. Stanley, Judge

### No. E2016-00584-COA-R3-CV

This is a medical malpractice action[1] in which the plaintiff filed suit against the hospital and her physicians following the death of her newborn son hours after his delivery. The case proceeded to a jury trial. The jury found in favor of the defendants. Following the denial of post-trial motions, the plaintiff appeals, claiming the trial court erred in excluding testimony and when it gave a jury instruction on the sudden emergency doctrine. We reverse and remand for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, JJ., joined.

Mark T. Hurt, Abingdon, Virginia, for the appellant, Brittany Nicole VanDyke.

Charles T. Herndon, IV, Elizabeth M. Hutton, and Stephanie E. Stuart, Johnson City, Tennessee, for the appellees, Medical Education Assistance Corporation, Brooke Elliott Foulk, M.D., and Howard Ernest Herrell, M.D.

Frank H. Anderson, Jr., Johnson City, Tennessee, for the appellee, Mountain States Health Alliance d/b/a Johnson City Medical Center.

---

[1] Tennessee Code Annotated section 29-26-101 now defines most all cases occurring in a medical context as "health care liability actions." Such an action "means any civil action . . . alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability, on which the action is based. . . ." Acts 2011, ch. 510, § 8. Effective April 23, 2012, the term "health care liability" replaced "medical malpractice" in the Code. Acts 2012, ch. 798. The provisions of the revised statute do not apply to this action because the injuries at issue here accrued before October 1, 2011.

**OPINION**

## I.    BACKGROUND

On February 24, 2011, Brittany Nicole VanDyke ("Plaintiff") presented to Clinch Valley Medical Center ("Clinch Valley") in Richlands, Virginia with signs of premature labor. At that time, Plaintiff was 24 weeks pregnant with dichorionic diamniotic twins,[2] Kayleigh ("Baby A") and Kadan ("Baby B"). Plaintiff's obstetrician arranged for her transport to Mountain States Health Alliance d/b/a Johnson City Medical Center ("JCMC") in Tennessee due to the prematurity of the twins. Plaintiff was given antibiotics to treat any infections that may have caused labor or could cause further complications, steroids to aid in the development of the babies' lungs, and magnesium to slow labor prior to transport. Following her arrival at JCMC, Plaintiff was given pain medication and additional doses of antibiotics and magnesium.[3]

The next morning, on February 25, 2011, Plaintiff was taken to the operating room for the impending delivery of her twins. Brooke Elliott Foulk, M.D., who was employed by Medical Education Assistance Corporation d/b/a University Physicians Practice Group ("Physicians Group"), served as the attending physician and was assisted by fourth-year residents, Jami Nicole Goodwin, M.D. and Rebecca C. Hobbs,[4] M.D. Dr. Goodwin delivered Baby A vaginally without incident. Baby A was then attended to by other physicians and transferred to the neonatal intensive care unit ("NICU").

Dr. Foulk then turned her attention to Baby B, who had settled into a transverse or sideways position. Dr. Foulk manually rotated him to a head-down orientation in the birth canal, and labor continued. The fetal monitor later indicated a drop in Baby B's heart rate, necessitating prompt delivery as a result of bradycardia.[5] Dr. Foulk instructed the delivery team to page Howard Ernest Herrell, M.D.,[6] also employed by Physicians

---

[2] A dichorionic diamniotic twin pregnancy means that each twin has an individual placenta and is contained within his or her own amniotic sac.

[3] It was later explained that the defendant physicians did not immediately proceed with a cesarean section upon Plaintiff's arrival because they sought to prolong delivery, with the immediate goal of allowing enough time to provide two doses of steroids in a 48-hour period. Despite their efforts, Plaintiff only received one dose of steroids before delivery was imminent.

[4] Formerly known as Rebecca C. McCowan.

[5] Bradycardia is defined as "relatively slow heart action." Merriam-Webster Online Dictionary (2017) (www.merriamwebster.com (derived from Merriam-Webster's Collegiate Dictionary 11th ed.)).

[6] Dr. Herrell fielded the initial call regarding Plaintiff's transport. His shift ended before her arrival.

Group.  He arrived moments later.  Drs. Foulk and Herrell assessed the situation and then proceeded to attempt an operative vaginal delivery by forceps.[7]  Dr. Herrell placed the first blade without incident.  He then proceeded to place the second blade while Dr. Foulk held the first.  Dr. Herrell met resistance and retracted the second blade before attempting placement a second time.  When his second attempt also proved unsuccessful, he retracted both blades.  The delivery team then prepared for cesarean section.

Approximately five minutes later, Drs. Foulk and Goodwin delivered Baby B, who had sustained a skull fracture and a scalp avulsion, meaning that his scalp was no longer attached but was hanging loose from the rear of his skull.  Baby B was then attended to by other physicians and transferred to the NICU.  He died hours later.  The immediate cause of death was listed as "hemorrhagic shock"[8] with underlying causes listed as "scalp avulsion with skull fracture" and "birth trauma."  William Devoe, M.D., the attending pediatrician who initially treated Baby B, later confirmed that hemorrhagic shock was a "major contributing factor" to Baby B's death.

On February 22, 2012, Plaintiff provided pre-suit notice of a potential suit against JCMC, Physicians Group, and Drs. Foulk and Herrell (collectively "Defendants").[9]  On June 22, 2012, Plaintiff filed a complaint, with an attached certificate of good faith, against Defendants, alleging medical malpractice, wrongful death, and loss of consortium.  Plaintiff essentially claimed that had the defendant physicians acted in a medically reasonable manner when the fetal monitor indicated bradycardia, they would have proceeded with an emergency cesarean section and avoided the catastrophic skull and scalp injuries that caused Baby B's death.  Physicians Group, on behalf of Drs. Foulk and Herrell, denied wrongdoing and claimed that the defendant physicians conformed to the standard of care for physicians in their specialty of obstetrics and exercised the degree of skill and care ordinarily possessed and exercised by physicians of good standing throughout the labor and delivery of the twins.  Physicians Group further claimed that the physicians did not proximately cause harm or injury by any alleged errors or omissions.

Likewise, JCMC denied wrongdoing and further claimed that it was not vicariously liable for the actions of Drs. Foulk and Herrell, who were not hospital employees.  JCMC also alleged its employees or agents complied with the applicable

---

[7] The record reflects that the doctors used forceps designed for premature infants that consist of two fenestrated blades that are placed separately then joined together for extraction of the fetus.

[8] Hemorrhagic shock is defined as "shock resulting from reduction of the volume of blood in the body due to hemorrhage."  Merriam-Webster Online Dictionary (2017) (www.merriamwebster.com (derived from Merriam-Webster's Collegiate Dictionary 11th ed.)).

[9] Drs. Goodwin and Hobbs, who were initially included in the complaint, were later dismissed as parties.

standard of care throughout the labor and delivery of the twins. JCMC later filed a motion for summary judgment, citing numerous forms signed by Plaintiff indicating her understanding that the physicians practicing at JCMC were not employed by JCMC. One such form provided, in pertinent part, as follows:

> RELATIONSHIP BETWEEN HOSPITAL AND PHYSICIANS/ALLIED HEALTH PROFESSIONALS: I have been informed and understand that the treating physicians . . . are not employees or agents, express or implied, in any manner of the hospital, but are independent practitioners having permission to practice at the hospital and make medical decisions as clinically determined by them.
>
> As such, I have been informed and understand that I may be treated in the Emergency Department or the hospital by any physician or health professional of my choice who may have clinical privileges to practice at this hospital. That physician or allied health professional, and not the hospital, will be responsible for directing the patient's care and shall exercise their own independent medical judgment during my care and the hospital does not control their treatment decisions.

Plaintiff responded, in pertinent part, by claiming that genuine issues of material fact remained regarding whether she received meaningful notice of the relationship between the hospital and defendant physicians under the circumstances presented and whether she had an adequate opportunity to make an informed choice. The court ultimately denied summary judgment, finding that there was

> evidence creating genuine issues of material fact as to whether: 1) JCMC held itself out to the public as providing medical services; 2) [Plaintiff] looked to JCMC rather than to individual healthcare providers at JCMC, including [the defendant physicians], to perform those services for her and her twins; and 3) [Plaintiff] accepted those services in the reasonable belief that the services were being provided by JCMC or its employees. While the Court finds that there was evidence that JCMC provided written notice to [Plaintiff] disavowing the existence of any employment or agency relationship with any physicians who would be treating her, the Court also finds that there are genuine issues of material fact as to whether that written notice constituted meaningful notice to [Plaintiff] in the circumstances in light of the evidence in the parties' submissions . . . .

Defendants filed a motion in limine before trial seeking to exclude testimony elicited during the depositions of Drs. Goodwin and Hobbs. The testimony at issue

concerned an approximate 30-second discussion between Drs. Foulk, Goodwin, and Hobbs in which Drs. Goodwin and Hobbs suggested that an emergency cesarean section was warranted. This discussion occurred prior to Dr. Herrell's arrival and the decision to proceed with delivery by forceps. The trial court excluded the testimony, finding that Drs. Goodwin and Hobbs were not qualified to give standard of care opinion testimony because they were not licensed physicians at the time. Further, the court granted Defendants' request to include a jury instruction on the "sudden emergency" doctrine.

The case then proceeded to a six-day jury trial, commencing on August 25, 2015, during which the jury was presented with a "battle of the experts." John Mercer Thorp, Jr., M.D., a professor of obstetrics and gynecology at the University of North Carolina's School of Medicine, opined that an emergency cesarean section was indicated at the time of bradycardia and that the decision to attempt an operative delivery by forceps and the actual attempt of delivery by forceps was a breach of the applicable standard of care due to Baby B's positioning in the birth canal, his prematurity, and the fact that Plaintiff was no longer fully dilated following delivery of Baby A. He believed Baby B died as a direct result of the injuries sustained during the attempted delivery by forceps. He further claimed that bradycardia was not an unexpected occurrence as evidenced by the fact that Plaintiff was taken to the operating room prior to delivery. He noted that the proper resources, including anesthesia, were readily available in the room to conduct a cesarean section because such an occurrence was anticipated. He agreed that neurological damage could occur within eight to ten minutes of bradycardia but claimed that the defendant physicians could have waited approximately three to four minutes to determine whether Baby B was truly bradycardic or simply experiencing a deceleration in his heart rate.

Michael Aaron Hawkins, M.D., a practicing general obstetrician and gynecologist in Dixon, Tennessee, claimed that Baby B's bradycardia necessitated immediate delivery and that the defendant physicians chose the fastest route using a method accepted in the medical community. He described the situation as an emergency and claimed that the defendant physicians did not deviate from the applicable standard of care by attempting delivery by forceps. He noted that a cesarean section is a major operation with risks of severe complications. He believed that the attempted delivery by forceps was a "great idea and a great option to expedite delivery." He explained that the placement of the second blade likely caused an initial laceration, which was extended when Baby B was removed during the cesarean section. He further alleged that Baby B's bradycardia was likely caused by placental abruption, which he claimed was not necessarily "an automatic" occurrence but was a "possibility" in twin deliveries that necessitated advanced mental preparation. He claimed that blood obtained from the umbilical cord indicated that Baby B was "severely acidotic and because of [his] extreme prematurity, [he was] even at further risk for a bad outcome" prior to the attempted delivery.

Brian Smith, M.D., a professor at Duke University School of Medicine, opined that Baby B had an approximate 66 percent chance of survival had he not sustained injuries during the attempted delivery, while Scott Osborn Guthrie, M.D., a neonatologist and assistant professor at Vanderbilt Medical School, opined that Baby B only had a 38 to 42 percent chance of survival as indicated by, inter alia, his prematurity, male gender, Caucasian race, birth order, and hospital location, factors known for affecting an infant's chance of survival. Dr. Guthrie further claimed that Baby B also experienced distress during labor prior to the failed extraction. His opinion was based upon the laboratory values drawn from blood obtained from the umbilical cord after delivery. He believed the blood's base deficit value indicated that Baby B was in distress at 9:47 a.m., two minutes prior to the drop in heart rate at 9:49 and three minutes prior to the failed extraction by forceps at 9:50. He alleged that the fetal distress experienced prior to the failed extraction was a "huge contributing factor" in Baby B's failure to survive.

Drs. Foulk, Herrell, Goodwin, and Hobbs also testified, as pertinent to this appeal, concerning their recollection of the labor and delivery of Baby B. Dr. Herrell stated that he entered the operating room after Baby B was bradycardic. He recalled immediately putting on his gown and gloves as he listened to Baby B's heartrate. He examined Plaintiff and found that she was fully dilated and that Baby B was in what he considered a proper position for an operative delivery by forceps. He described a "bigger sense of urgency" among the staff and stated that the situation presented was "an emergency of all emergencies." He stated, "I don't know the words that were used, but the consensus was that if I thought we could do this, let's get it done." He provided that he later confirmed that Baby B was bradycardic as a result of placental abruption, which he characterized as a "catastrophic emergency that was threatening [Baby B's] life."

Dr. Herrell testified that he was a third-year attending at the time of Plaintiff's delivery, while Dr. Foulk was a first-year attending. He explained that she likely deferred to him for placement of the forceps because of his two additional years of training. He recalled that the forceps were ready and available on the surgical table at the time of his arrival. He confirmed that the use of forceps in this case was unusual due to Baby B's positioning in the birth canal and further explained that he had only performed a forceps delivery on one other set of premature twins at a gestational age of 32 weeks. He agreed that a 23 to 24-week infant has delicate skin.

Dr. Foulk testified that Plaintiff was at risk for complications due to the fact that she was carrying twins, had hypertension, was obese, and had a history of insulin resistance. She stated, "[W]e know with twin pregnancy anything you can imagine going wrong or scary in pregnancy is times a thousand." She noted that Plaintiff was either 24 weeks and 2 days or 23 weeks and 5 days along in her pregnancy, depending upon whether the ultrasound or the last menstrual period was used as the marker. She

explained, "[W]e were hoping for the best and worried [about] what could happen." She recalled that Plaintiff desired a vaginal delivery, if possible once labor was imminent. She explained that the type of cesarean section required was a "much more serious procedure" than what could be performed for a term pregnancy. She recalled that she remained in the hospital after her initial consultation with Plaintiff because "[a]nything that high risk, you don't want to [not be] there, something could happen."

Dr. Foulk testified that Plaintiff was moved to the operating room once they discovered that delivery was imminent. She explained,

> This is not just going to be [a] simple delivery. We knew we needed the operating room. We knew we need[ed] ultrasound. Anesthesia. Two NICU teams. All of us. It's a big ordeal.

She stated that once in the operating room,

> [i]t felt like an army, it always does when there's that many people there. In the operating room[,] we talked about moving her from the rolling comfortable bed to the small operating table. Stir-ups have to be placed on and screwed on and in the right place. Get her legs up. And everybody ready. Warmer is on. Anesthesia is ready.

She recalled moving Baby B into position a few minutes after delivering Baby A. She provided that Plaintiff's water broke at 9:43 a.m. and that Baby B's heartrate dropped at 9:49, at which point "[Plaintiff] became a sudden emergency." She continued,

> Thankfully[,] I had already called Dr. Herrell. At that point if I hadn't, I'd call for help. It wasn't - - she's at zero station, let's stop and talk about this. She's at half a station. She was pushing. We were concerned. I was having her push. I was assessing, can I do a [cesarean] section? Can I do forceps or vacuum? I can't do a vacuum. You think through your head as you are saying algorithms. Here's what I'm presented with. I'm thinking on my toes, I'm thinking quickly. Here's my options. What's the safest option? Help is coming so I have more hands-on deck if needed. She was making progress but it wasn't going to be quick enough to get him out [safely] and still be alive or intact, so we had to deliver him at that point.

She recalled advising Plaintiff that the situation was an emergency and gaining her consent to attempt an operative delivery by forceps while Dr. Herrell was examining her. She stated that she and her team immediately began preparations for a cesarean section once the attempted delivery by forceps failed. She noted that delivery by forceps could

have occurred within 30 to 45 seconds, while it took approximately 5 minutes to deliver Baby B by cesarean section. She asserted that Plaintiff's cesarean section was likely the fastest she had ever performed.

Dr. Goodwin recalled that she accompanied Plaintiff to the operating room for delivery once labor was imminent. She explained that it was "standard protocol to deliver all twins in the [operating room]." She provided that once in the operating room, they prepped Plaintiff for delivery and delivered Baby B. She then examined Plaintiff and found that she was no longer fully dilated. She could not recall whether she gave a measurement but claimed that she advised the delivery team that

> it felt funny to me, that it wasn't fully, that it didn't feel fully dilated, but I couldn't feel presenting part, but as the intern, since I was unsure, [I] had immediate back-up by my [a]ttending who was there immediately to take over.

She provided that once Dr. Foulk stepped in, she stepped behind the delivery table. She recalled that Dr. Foulk examined Plaintiff and advised her that delivery was necessary. She explained that once Baby B's heartrate declined, "delivery went from being necessary now to being necessary urgently." She could not recall whether Dr. Foulk called for another attending at that point or whether one had already been summoned. She continued,

> Dr. [Hobbs] and, the three of us didn't have a discussion so much as just the baby needed to be delivered urgently. Dr. Foulk was going to get the opinion of another attending.

She recalled that Dr. Herrell arrived approximately one minute later. She continued,

> He and Dr. Foulk [then] had a discussion. I was not, didn't hear every bit of the discussion, didn't really hear the majority. Dr. Herrell put on gloves, and they attempted a forceps delivery.

She stated that the discussion between Drs. Foulk and Herrell lasted less than one minute before they indicated agreement that the "quickest way and safest way for delivery at that moment would be to attempt forceps" and gained consent from Plaintiff. She explained that an announcement was not made but that the delivery team knew that an attempt at delivery by forceps was imminent because Dr. Foulk gained consent from Plaintiff and prepared for the attempt. She recalled that once delivery by forceps proved unsuccessful,

[t]he decision was made to do an emergency [cesarean section], and the table was already set up for a [cesarean section] as is normal protocol for twins, and I was sterilely gowned and gloved as was Dr. McCown and Dr. Foulk. [Plaintiff] was put to sleep. Immediately once [Plaintiff] was put to sleep, anesthesia gave us an indication that it was safe to begin the procedure.

Dr. Hobbs testified by deposition, as pertinent to this appeal, that she was present for the labor and delivery of the twins as an upper level resident in her fourth year of residency. She was responsible for supervising Dr. Goodwin, the lower level resident. She confirmed that Plaintiff's cervix was no longer fully dilated when Dr. Foulk examined her following the delivery of Baby A. She provided that the medical records reflected that Plaintiff was 7 centimeters dilated at the time of Dr. Foulk's exam. She recalled that Dr. Foulk then repositioned Baby B and that an attempt was made to deliver vaginally once Plaintiff's water broke. She provided that Plaintiff was attempting to push as instructed when Baby B's heartrate declined, at which time, Dr. Foulk advised Plaintiff that she could proceed with a caesarean section. She stated that she and Drs. Foulk and Goodwin had an approximate 30-second discussion before Dr. Herrell arrived. She noted that once he arrived, she and Dr. Goodwin stepped back as he began examining Plaintiff with Dr. Foulk.

Following the presentation of the above evidence, the court submitted the case to the jury. The jury found in favor of Defendants. This timely appeal followed the denial of post-trial motions.

## II. ISSUES

As a threshold issue, JCMC claims that the court erred in denying its motion for summary judgment. This issue is not reviewable on appeal because a judgment was rendered following a trial on the merits. *Tate v. Cnty. of Monroe*, 578 S.W.2d 642, 644 (Tenn. Ct. App. 1978) ("Where the trial court's denial of a motion for summary judgment is predicated upon the existence of a genuine issue of fact, the overruling of that motion is not reviewable on appeal where there has been a judgment rendered upon a trial of the merits of the case."); *see also Hobson v. First State Bank*, 777 S.W.2d 24, 32 (Tenn. Ct. App. 1989) (citing *Tate* for the same proposition). While Plaintiff does not challenge the jury's verdict, she asserts that errors committed by the trial court necessitate reversal on appeal. We restate these issues as follows:

A. Whether the court abused its discretion in ruling on the admissibility of evidence.

B.     Whether the court committed reversible error by providing a jury instruction on the sudden emergency doctrine.

## III.   DISCUSSION

### A.

Plaintiff argues that the trial court abused its discretion in excluding testimony from Drs. Goodwin and Hobbs. She claims that the court erroneously excluded the testimony as improper standard of care opinion testimony from unlicensed physicians pursuant to Tennessee Code Annotated section 29-26-115(b). She provides that the testimony was not offered to establish the standard of care but to establish the res gestae or circumstances surrounding the decision, namely that "the cesarean option had been specifically and explicitly voiced and discussed amongst the delivery team" prior to the attempted delivery by forceps. She further claims that the erroneous exclusion of the testimony was compounded by the fact that the court gave an instruction on the sudden emergency doctrine. Defendants respond that the testimony was properly excluded because it did not serve a legitimate purpose other than to establish the standard of care.

Rulings on admissibility of evidence are within a trial court's discretion. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause [s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). We review the decision of the trial court to determine:

> (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principle, and (3) whether the trial court's decision is within the range of acceptable alternatives.

*White*, 21 S.W.3d at 223. Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White*, 21 S.W.3d at 222.

Section 29-26-115 provides, in pertinent part, as follows:

> (a) In a health care liability action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

- 10 -

(1)     The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2)     That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3)     As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

We agree with Plaintiff that the testimony at issue was not offered to establish the appropriate standard of care and causation elements required in medical malpractice suits. To the contrary, Plaintiff sought to establish those elements through Dr. Thorp. Accordingly, the trial court abused its discretion by excluding the testimony at issue if it was relevant and admissible.

Relevant evidence is defined by Rule 401 of the Tennessee Rules of Evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "In other words, evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4], at 4-9 (5th ed.2005). If the evidence is relevant, it is admissible unless another legal rule excludes it. Tenn. R. Evid. 402.

The testimony at issue concerned a discussion between Drs. Foulk, Hobbs, and Goodwin that occurred approximately 30 seconds prior to Dr. Herrell's arrival in which Drs. Hobbs and Goodwin recommended that they proceed with a cesarean section. Specifically, Dr. Hobbs testified as follows:

I mean, we as a team, as a learning team and that sort of thing, always discuss at the time what we think should happen. So you know, at one point I do remember, before the forceps were applied, that I sort of think my recommendation at that point was to proceed with a [cesarean] section.

Likewise, Dr. Goodwin testified as follows:

The routes of delivery were discussed briefly [before Dr. Herrell's arrival], and it was discussed whether or not we thought she had adequate pain relief to be able to push a baby out at that point, whether it would be helpful to use instruments for delivery or whether she should proceed with [cesarean section] at that point. As it was, you know, discussed.

She continued that her suggestion, which she communicated to Dr. Foulk as an intern with the lowest level of authority, was to "immediately deliver by [cesarean] section."

We believe that this testimony was relevant to establish that Dr. Foulk had the presence of mind and the time, albeit minimal, to consider her options before proceeding with an operative delivery by forceps. However, we believe that the testimony at issue was also inadmissible hearsay because the specific statements were offered to prove the truth of the matter asserted, namely that Drs. Goodwin and Hobbs advised Dr. Foulk to proceed with a cesarean section, not to establish the res gestae or circumstances surrounding the event in question. Tenn. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). The exclusion of the testimony, even if admissible, was harmless when Plaintiff was permitted to establish that a discussion occurred between Drs. Foulk, Goodwin, and Hobbs prior to Dr. Herrell's arrival and that another discussion occurred between the defendant physicians before the attempted delivery by forceps. Further, testimony was also presented establishing that Dr. Foulk considered proceeding with a cesarean section at the time Baby B became bradycardic before she ultimately opted to attempt delivery by forceps.

B.

Plaintiff argues that the court erred in instructing the jury on the sudden emergency doctrine. Defendants respond that the instruction was proper under the circumstances presented in this case.

"Whether a jury has been properly instructed and whether an error in instruction more probably than not affected the jury's verdict are questions of law that are reviewed de novo with no presumption of correctness." *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn.2007). The instruction provided to the jury was as follows:

> A doctor who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy of judgment as a doctor acting under normal circumstances who has time to think and reflect before acting.

> A physician faced with a sudden emergency is required to act as a reasonably careful physician placed in a similar position. A sudden emergency will not excuse the actions of a doctor whose own negligence created the emergency.

> If you find there was a sudden emergency that was not caused by any fault of the doctors whose actions you're judging, you must consider this factor in determining and comparing fault.

Plaintiff argues that the instruction was given in error when there was no material evidence to establish that the situation presented was unexpected or that the defendant physicians had little time to think and reflect before acting. She claims that the instruction is only warranted when the emergency is sudden *and* unexpected, not sudden *or* unexpected. Defendants respond that the court did not err in providing the instruction under the circumstances presented in this case, namely they claim that the emergency was sudden and unexpected, leaving no time for deliberation. Further, they claim that any error in instructing the jury on the sudden emergency doctrine was harmless when the instruction given was one of many considerations in the jury's decision-making process.

The sudden emergency doctrine is generally considered in cases of comparative fault involving motor vehicle accidents; however, it has also found application in the medical malpractice context, albeit infrequently. *Olinger v. Univ. Med. Ctr.*, 269 S.W.3d 560, 568-69 (Tenn. Ct. App. Jan. 18, 2008) ("[T]he sudden emergency doctrine has a limited application in medical malpractice cases. Simply because there is a medical

- 13 -

complication does not necessarily mean that there is a sudden emergency."). Our Supreme Court explained the doctrine as follows:

> The sudden emergency doctrine, which has now been subsumed into Tennessee's comparative fault scheme, recognizes that a person confronted with a sudden or unexpected emergency which calls for immediate action is not expected to exercise the same accuracy of judgment as one acting under normal circumstances who has time for reflection and thought before acting.
>
> The doctrine no longer constitutes a defense as a matter of law but, if at issue, must be considered as a factor in the total comparative fault analysis.

*McCall v. Wilder*, 913 S.W.2d 150, 157 (Tenn. 1995) (internal citations and footnote omitted); *see also Olinger*, 269 S.W.3d at 563-64, (citing the same for explanation of the doctrine).

The parties in this case place emphasis on whether the emergency must be both sudden and unexpected. The record reflects that the emergent situation presented was a sudden occurrence but was not unexpected, as evidenced by the decision to deliver in the operating room rather than a birthing suite, the presence of an "army" to assist in the delivery, and the advanced preparations made in an attempt to expect the unexpected. While we agree that the presentation of the instruction in the disjunctive affects the application of the doctrine, we believe the greater distinction in this case lies in whether the defendant physicians were presented with a sudden or unexpected emergency that "call[ed] for immediate action" as opposed to someone who "ha[d] time for reflection and thought before acting." Here, Dr. Foulk testified,

> I was assessing, can I do a [cesarean] section? Can I do forceps or vacuum? I can't do a vacuum. You think through your head as you are saying algorithms. Here's what I'm presented with. I'm thinking on my toes, I'm thinking quickly. Here's my options. What's the safest option? Help is coming so I have more hands-on deck if needed. She was making progress but it wasn't going to be quick enough to get him out [safely] and still be alive or intact, so we had to deliver him at that point.

Dr. Foulk also conferred with her delivery team before Dr. Herrell arrived. Further, Drs. Foulk and Herrell conferred together and decided on what they considered the best course of action before proceeding.

Accordingly, we conclude that the court erred in issuing a jury instruction on the sudden emergency doctrine when the defendant physicians had time, while minimal, for reflection and thought before deciding on the best course of action. We further hold that this error more probably than not affected the outcome of this case when Dr. Herrell classified this case as an "emergency of all emergencies" and Dr. Foulk claimed that Plaintiff became a "sudden emergency" at the first sign of bradycardia. The record reflects that the defendant physicians repeatedly referred to the sudden and unexpected nature of this event and the need to act immediately to save Baby B's life. With these considerations in mind, we remand this case for a new trial.

## IV.    CONCLUSION

The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion. Costs of the appeal are taxed equally to the appellees, Medical Education Assistance Corporation, Brooke Elliott Foulk, M.D., Howard Ernest Herrell, M.D., and Mountain States Health Alliance d/b/a Johnson City Medical Center.

_____
JOHN W. McCLARTY, JUDGE