FILED
06/26/2026
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2025 Session

## TAYLOR THORNTON, III, ET AL v. T.M.D. FARMS, INCORPORATED

Appeal from the Chancery Court for Haywood County
No. 2022-CH-4     Michael Mansfield, Chancellor

_____

No. W2025-00190-COA-R3-CV
_____

This appeal involves a complaint to quiet title and for injunctive relief and damages stemming from a boundary line dispute. The defendant, a farming corporation, executed a deed containing a written description that included an 11.28-acre area of land which lies along the southern border of its property. The plaintiffs became aware of the deed and filed this action, alleging that they owned the 11.28 acres at issue. Both parties claimed to have paid taxes on the disputed area for many years. The plaintiffs had their property surveyed, and the surveyor determined that they owned the disputed area. The farm had its property surveyed twice. Those surveyors agreed the farm owned the disputed area. The chancery court found that both parties had paid taxes on the disputed area for at least the preceding 20 years. The chancery court also determined that the surveys provided by the defendant farm accurately reflected the boundary line at issue and found it owned the disputed area. The court also made an alternative holding that the farm had acquired the disputed property by adverse possession. The plaintiffs appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and VALERIE L. SMITH, J., joined.

Matthew R. West and Morgan L. Weeks, Jackson, Tennessee, for the appellants, Taylor Thornton, III, and Carter Edwards.

Jay Dustin King, Foley, Alabama, for the appellee, T.M.D. Farms, Incorporated.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This appeal arises from a boundary line dispute between neighboring property owners. The property at issue is located in Haywood County, Tennessee, along the border of tracts of real property owned by Taylor Thornton, III, and T.M.D. Farms, Incorporated ("T.M.D. Farms"). Mr. Thornton's tract ("the Thornton property") consists of 104 acres. The property belonging to T.M.D. Farms ("the T.M.D. property") borders the Thornton property to the north and consists of approximately 100 acres. The parties dispute which of them owns an 11.28-acre portion of property ("the disputed area") running along this border. The parties have owned their respective properties for many years. T.M.D. Farms is owned by Tommy Dobbins. The T.M.D. property was conveyed to Mr. Dobbins's grandfather in 1957. The property was eventually conveyed to Mr. Dobbins, and he conveyed the property to T.M.D. Farms in 2005.[1] Mr. Thornton's father acquired the Thornton property in 1947, and he conveyed it to Mr. Thornton in 1963. In 2006, Mr. Thornton leased the Thornton property to Carter Edwards. The lease agreement included a 50-year term and a purchase option.

On May 29, 2013, Mr. Edwards sent a letter to Mr. Dobbins informing him that he intended to "exercise control" over the disputed area. At that point, T.M.D. Farms had been farming the disputed area for many years. In 2017, Mr. Edwards constructed a driveway permitting access to the disputed area. He also installed a culvert, a drainage ditch, and planted trees in the disputed area. The presence of the drainage ditch left T.M.D. Farms unable to farm the disputed area, but it bushhogged the trees in 2022. At some point, Trace Dobbins, Tommy Dobbins's son and the senior vice president of T.M.D. Farms, went to the Haywood County Property Assessor's office to inquire about the T.M.D. property's tax map. The map reflected that the disputed area was a part of the Thornton property. Trace Dobbins was informed that a survey would be needed in order to change the map. T.M.D. Farms had the T.M.D. property surveyed. On December 15, 2021, T.M.D. Farms executed and recorded a quitclaim deed to itself featuring a written description of this survey that included the disputed area.

Mr. Thornton and Mr. Edwards filed a complaint to quiet title on January 25, 2022. The plaintiffs claimed that the disputed area was included in the property conveyed to Mr. Thornton's father in 1947. The plaintiffs also asserted that they had paid the property taxes on the disputed area for more than 20 years. Accordingly, they argued that the provisions of Tennessee Code Annotated sections 28-2-109 and 28-2-110 created a presumption of ownership in their favor and prevented T.M.D. Farms from claiming ownership of the disputed area. T.M.D. Farms filed an answer and counterclaim contending that it owned and had paid taxes on the disputed area for a long period of time, and, alternatively, it owned the disputed area by adverse possession. It also sought damages based on its inability to farm the disputed area since the installation of the ditch. The plaintiffs hired a

---

[1] Although the deed was executed on November 4, 2005, it was not recorded with the Haywood County Register of Deeds until January 4, 2008.

surveyor to survey the Thornton property. T.M.D. Farms hired a second surveyor to complete an additional survey of the T.M.D. property.

The plaintiffs filed a motion for summary judgment claiming that because they had paid taxes on the property for at least 20 years, they were entitled to ownership of the disputed area pursuant to Tennessee Code Annotated sections 28-2-109 and 28-2-110. The chancery court denied the motion for summary judgment.[2] The matter proceeded to trial in September 2024.

Goldie Harwell was the first witness to testify. Ms. Harwell is a deputy assessor of property for the Haywood County Property Assessor's Office ("the assessor's office"). She explained that the assessor's office is tasked with appraising, identifying, and locating all real property within the county for the purpose of taxation. The assessor's office also creates maps of property based on deeds, which are used to show who holds the responsibility for paying taxes on tracts of land. However, Ms. Harwell noted that taxpayers do come into the office to dispute their maps or assessments and acknowledged there were "sometimes errors in [maps and parcels]." If a taxpayer asserts that an error has occurred, the office collects the property's records and reviews its transfer and deed information to determine whether the map at issue matches that information.

Ms. Harwell reviewed the property records for the Thornton property, which indicate the property "has total land units of 104 acres."[3] She also reviewed the property records for the T.M.D. property. She noted that it is located partially in Haywood County and partially in Crockett County. The total tract is comprised of 100 acres, 73 of which are taxed in Haywood County. Ms. Harwell also reviewed documents found in the records of the assessor's office concerning the Thornton property. One document was the 1947 deed that conveyed the Thornton property to Mr. Thornton's father. She noted that the deed was a "bounded deed," which relied on the boundary descriptions of adjacent properties instead of providing "calls" based on distances measured by the surveyor. She stated that these types of descriptions are commonly found in older deeds. Also contained in the file was a survey completed by Ashley Wiles in 1952 ("the Wiles survey"). The document indicates that Mr. Wiles moved and/or altered the position of several iron pins located during the course of his survey. Ms. Harwell explained that it was very uncommon for a survey to indicate a monument had been moved. She stated that during "all the years that [she] worked, [she] never saw one that said an iron pin ha[d] been moved[.]" Additionally, she noted that the tax map did not reflect this iron pin as having been moved.

---

[2] While this order is not contained in the appellate record, both parties acknowledged in the respective briefs that the motion for summary judgment was denied by a written order entered on September 9, 2024.

[3] Ms. Harwell also noted that the records for the Thornton property indicated that a mapping error was detected at some point. At some point, despite an older deed stating that the Thornton property contained 104 acres, it was assessed as containing 105 acres or 116 acres. This appears to have been corrected in 1973, and the Thornton property has been taxed on 104 acres since that time.

Regardless, she maintained that the survey indicated that the total acreage of the Thornton property was 104 acres and corresponded with the current tax map.

Ms. Harwell explained that the records of the assessor's office indicated that it had taxed the disputed area to Mr. Thornton, and he had paid those taxes since acquiring it. However, she had previously seen tracts of property "overlap" and assessed to multiple property owners. She testified that she did not believe there was an overlap between the Thornton property and T.M.D. property. Nevertheless, she acknowledged that it was "not out of the realm of possibility" that both T.M.D. Farms and the plaintiffs had paid taxes on the disputed area and could not "rule out" that double taxation was occurring.

Mr. Edwards was the next witness to testify. Mr. Edwards discussed several deeds that were part of the Thornton property's chain of title. The first deed was recorded on August 29, 1936, and transferred the property from Tillie Wilson to Joe Cooper. The deed contains a metes and bounds description of the Thornton property and indicates it contains 104 acres, more or less. The next deed contained in the chain of title was recorded on October 22, 1947, and transferred the property from Mr. Cooper to Mr. Thornton's father. This deed is a bounded deed and states that the Thornton property is comprised of 105 acres. The third deed was recorded on March 16, 1963. This deed also contains the bounded description set forth in the 1947 deed and states that the Thornton property is comprised of 105 acres. Mr. Edwards explained that, after he signed the agricultural lease in 2006, Mr. Thornton used the initial proceeds to pay several years' worth of back taxes. His business has paid the taxes since that time. Mr. Thornton paid the taxes in all previous years.

Trace Dobbins also testified. Mr. Dobbins reviewed a 1957 deed in which his great-grandfather received title of the T.M.D. property from Gladys Conyers Stewart. Subsequently, the T.M.D. property was conveyed to his grandfather, then to his father, and then to T.M.D. Farms. Mr. Dobbins testified that T.M.D. Farms pays taxes on the property in both Crockett County and Haywood County. He also noted that this was the only property T.M.D. Farms owned which was located in Haywood County. He reviewed tax receipts that demonstrated that T.M.D. Farms or the Dobbins had paid property taxes on 73 acres in Haywood County annually since 1993. He stated that his family had been farming the T.M.D. property, including the disputed area, "ever since [he could] remember."[4]

As stated above, both the plaintiffs and the defendant hired surveyors to survey the properties. The plaintiff hired one surveyor who determined that the disputed area was part of the Thornton property. The defendants hired two surveyors who both determined that the disputed area was part of the T.M.D. property. Each of these surveyors testified as expert witnesses during the trial.

---

[4] Mr. Dobbins was 27 years old at the time of trial.

- 4 -

Jonathan Dodd was the first surveyor to testify. Mr. Dodd is a licensed surveyor and was hired by the plaintiffs to survey the Thornton property. Mr. Dodd explained that surveyors often rely on monuments referenced in deeds to ascertain the locations of boundary lines. Monuments are markers that can be either natural or manmade. He stated that surveyors have rules assigning different types of monuments different "priority of weights." Natural objects or landmarks are given the highest level of priority due to their permanent nature. Artificial markers such as fences, iron pins, and other similar items, are given the second level of priority. Boundary lines, courses and distances listed in a deed, and acreage may also be considered, but are given less priority.

Mr. Dodd also explained the process he used while conducting his survey of the Thornton property. He reviewed the deeds from the Thornton property's chain of title, as well as deeds concerning adjacent properties. One such deed concerned an adjacent property that Mr. Edwards had conveyed to his business ("the Team Carwards deed"). Mr. Dodd explained that the Team Carwards deed contained "finite calls" from the center of the Forked Deer River, which is a man-made canal running along the western border of the Thornton property. Using these calls, he was able to locate an iron pin and buggy axle that he determined represented the northwest corner of the Thornton property. After he located that corner, he was able to locate another buggy axle, which he determined marked the southwest corner of the Thornton property. From there, he located the remnants of a fence located on the eastern portion of the property that he determined marked the eastern boundaries of both the Thornton property and the T.M.D. property. He verified the various monuments he located during his survey by comparing their locations with those contained in the description of the Team Carwards deed. He stated that, according to his survey, the disputed area "was located within the Thornton tract." Mr. Dodd also noted that he reviewed the 1936 and 1947 deeds contained in the Thornton property's chain of title. He acknowledged that the 1947 deed was a bounded deed but stated he was "comfortable" with those types of "deeds being used[.]" He noted that this bounded deed also referenced the 1936 deed in its history of title. In considering the 1936 deed, he explained that it called for the northern boundary of the Thornton property to be a straight line. He indicated that this was consistent with the map created by the assessor's office.

Mr. Dodd acknowledged that the Wiles survey indicated the surveyor moved at least one iron pin several feet and adjusted several others. He further stated that he did not look for or rely on any of the trees or bushes referenced in the 1936 deed. Additionally, he explained that neither the 1936 deed nor the 1947 deed referenced the Forked Deer River as a monument because it had apparently been constructed after they had been executed. Nevertheless, he treated the river as a natural landmark.

Bruce Richardson was the second surveyor called to testify. Mr. Richardson surveyed the T.M.D. property. Mr. Richardson co-owns and operates Surveying Services in Jackson, Tennessee. Trace Dobbins is an employee of Surveying Services and

performed a portion of the fieldwork for the survey of the T.M.D. property. Mr. Richardson explained that he began by collecting relevant information from deeds and property records. His crew visited the T.M.D property and located monuments such as a railroad bed. He also reviewed several deeds concerning adjacent properties, including a deed concerning a tract of land owned by the Beaird family that borders the eastern portion of the T.M.D. property's northern boundary. The deed referenced Johnson Grove Road, which runs along the northern boundary of the Beaird property. Mr. Richardson located the road and used calls set out in the Beaird deed to develop a southern boundary line consistent with the "Conyers' north line." He explained that the T.M.D. property was once owned by the Conyers family and was referenced as the Conyers property in older deeds. In this way, he used the call in the Beaird deed identifying its southern boundary to locate the northern boundary of the T.M.D. property.

Mr. Richardson testified that the primary monument upon which he relied was Johnson Grove Road. He also relied on a barbed wire fence located along the eastern boundary of the property. Mr. Richardson stated that he used GPS technology to make his calls in conjunction with the markers. He reviewed a line from the pin Mr. Dodd located near the southeast corner of the T.M.D. tract but was unable to locate the remnants of a fence referenced by Mr. Dodd, which he stated ran across the northern boundary of the Thornton property. Mr. Richardson stated that he relied on the location of the road, calls contained in the description of the Beaird tract, and certain information contained in the deed of another adjacent property to locate the northeast corner of the T.M.D. property. However, he noted that there were no monuments located at the corner when he located it. Nevertheless, Mr. Richardson stated that, in his opinion, T.M.D. Farms owned the disputed area.

Mr. Richardson also reviewed deeds from the Thornton property's chain of title. The first was executed in 1919 and contained a bounded description that referenced the Conyers southern boundary as marking the northern boundary of the Thornton property. Additionally, he reviewed a deed from 1921 that concerned the Thornton property. Mr. Richardson explained that these deeds contained certain differences. Most notably, while the 1919 deed contained a bounded description, the 1921 deed contained a metes and bounds description. He noted that the buggy axle located at the Thornton property's southeast corner, and upon which Mr. Dodd relied when surveying the Thornton property, is not referenced in the 1919 or 1921 deed. Rather, the 1919 deed calls for the northern border of the Thornton property to run along the southern border of the Conyers property. Meanwhile, the 1921 deed states that the point of beginning for the survey would be "the northwest corner of the Fort Ridge farm." Mr. Richardson stated that he was unable to determine where Fort Ridge farm was located. Therefore, while he found the buggy axle upon Mr. Dodd relied, he could not determine if it was an accurate representation of the Thornton property's southeast corner. Mr. Richardson also stated that a surveyor would not be able to prove the boundaries of the Thornton property based solely on the 1919 deed, because the deed is a bounded deed. Accordingly, a surveyor would be required to locate

the Conyers line to locate the northern boundary.

Mr. Richardson stated that he believed Mr. Dodd's survey was incorrect because it relied on the buggy axle he located despite the axle not being referenced in the 1921 metes and bounds deed. He also noted it was unusual that the Wiles survey indicated a surveyor moved a pin while performing his work. He explained that, as the pin had been moved to the north, it resulted in the Thornton property's northern boundary encroaching on the T.M.D. property's southern boundary. He stated that the position of the Conyers southern boundary line was of key importance in establishing the boundary line at issue because the 1919 Thornton property deed, the oldest deed in the Thornton property's chain of title, used it as the marker for its northern boundary. He also explained that there were instances in which it was appropriate to rely on the lower tier of monuments, such as boundary lines and distances, to overrule manmade monuments. He stated there were even situations in which it would be appropriate to "disregard" a monument.

Additionally, Mr. Richardson noted that the 1936 and 1947 Thornton property deeds rely on the Conyers boundary line as a description of the property's northern boundary line. He again noted that the 1936 deed did not reference a buggy axle and did not contain a plottable starting point in its description of the Thornton property. While he eventually located the buggy axle upon which Mr. Dodd relied, he could not determine whether it was an accurate representation of the Thornton property's northwest corner. Mr. Richardson explained that he did not rely on the buggy axle or "bar ditch" when surveying the property but did use the fence line referenced by Mr. Dodd. Mr. Richardson acknowledged that the adoption of his survey would likely have implications on the boundaries of adjacent properties. He also acknowledged that his survey contradicted the property assessor's map and the Wiles survey. He stated that the Thornton property was likely comprised of the acreage listed in the deed but needed to be shifted south to border a riverbed.

The final surveyor called to testify was Michael Maness. Mr. Maness was asked to survey the T.M.D. property after Mr. Richardson had done so. Mr. Maness stated that he located additional deeds concerning the T.M.D. property, one of which dated back to 1896. Mr. Maness stated that he conducted his survey using these deeds, and his boundary line for the disputed property matched Mr. Richardson's. He also reviewed the Wiles survey and found it was "very unusual" that it noted the surveyor moved monuments. He was able to locate the pin set by Mr. Richardson representing the northeast corner of the T.M.D. tract and checked the deeds of adjacent properties. The deed concerning the adjacent Beaird property led him to take measurements from Johnson Grove Road. He stated that he was able to locate the old railroad bed and used it to mark his lines. He explained that after he had located his points of interest, he began plotting the deeds and his "measurements came out pretty close to what they were supposed to be" and were "reasonably consistent" with those set out in 1896. Mr. Maness acknowledged that he used the pins set by Mr. Richardson when performing his survey but explained this was because his "survey matche[d] the Richardson survey to the inch." He stated that the "odds" of two

surveyors generating calls within this margin of error were "[p]retty high with nowadays' equipment[.]"

Mr. Maness also reviewed the chain of title for the Thornton property. He noted that the oldest deed in the chain of title was the 1919 bounded deed, which called for the northern boundary to be marked by the southern boundary of the Conyers property. He stated that it was "unusual" that the 1919 deed contained a bounded description, but the 1921 deed contained a metes and bounds description, which itself was followed by a return to the bounded description in the 1947 deed. He stated that, "[n]ormally, when you've got a bounds deed, and it goes to a . . . metes and bounds deed, it stays a metes and bounds deed. For some reason, this one went back to a bounds deed again." He noted that this affected his decision making while performing the survey because he felt "something's not right about that. That's not normal." He explained that while there was nothing "wrong" with a bounded deed, they are not as precise as metes and bounds deeds. He also noted that he did not see references to buggy axles or fences while reviewing the Thornton property deeds. He acknowledged that the adoption of his survey could have implications on the boundaries of properties adjacent to the Thornton property. Mr. Maness noted that he deemed the description of the 1896 deed referencing the Conyers line as marking the line as a monument in surveying the property. He stated that while Mr. Dodd's measurements were likely correct, he located an incorrect point of beginning because he relied on buggy axles, which Mr. Maness believed were in an incorrect position. Mr. Maness also testified that, in his opinion, the use of "a road would be more reliable than a river" in this case because the river at issue has "been channelized has . . . moved." Conversely, a road typically does not move.

Subsequently, Mr. Dodd returned to the stand for rebuttal testimony. Mr. Dodd noted that, while the term buggy axle did not appear in the deeds at issue, the term was a generalization for stakes, and such indicators did appear in various deeds. He also reaffirmed his reliance on the Team Carwards deed and stated that it served to establish the southwest corner of the Thornton property. He maintained that his survey was confirmed by various monuments.[5] He reviewed the Richardson and Maness surveys and determined that they were "essentially identical" to "the quarter of an inch." He stated that this was odd because, due to natural leans and angles of pins driven into the ground, two surveyors would be unlikely to shoot the same calls with this level of precision. He also alleged that Trace Dobbins conducting fieldwork for the Richardson survey created a conflict of interest. This concluded the trial.

The chancery court entered its final order on January 15, 2025. The court made

_____

[5] Mr. Dodd also alleged that Mr. Richardson's survey left a "gap" in the Beaird property as it did not properly return back to the point of beginning. However, as the chancery court noted in its final order, this deed was not included in the record, and the allegation was not sufficiently explained by the testimony to be of consideration.

several pertinent findings of fact. First, it found that both parties had paid taxes on the disputed area for at least 20 years. The chancery court noted that the plaintiffs had "explicitly been taxed for the disputed [area]." However, the court also found that T.M.D. Farms had been assessed and paid taxes on 73 acres in Haywood County "implicitly." The court found that, based upon the review of the various surveys and T.M.D. Farms's property tax cards, if the disputed area had not been taxed to T.M.D. Farms, it would only have been assessed 62 or 63 acres in Haywood County. Therefore, because T.M.D. Farms had paid taxes on 73 acres, the court found it had been taxed on the disputed area. Additionally, the chancery court found that there was no evidence contained in the record demonstrating the boundaries described in the 1919 Thornton property deed matched the metes and bounds description set forth in the 1921 deed that is the basis of the 1936 deed relied upon by the Dodd survey. The court found that the surveys completed by Mr. Richardson and Mr. Maness "accurately reflect[ed] the boundaries and ownership of the disputed property at issue." It also found that these surveyors were able to establish the northwest corner of the T.M.D. property using the deed of an adjacent tract and created a survey matching its description using the metes and bounds description contained in the 1896 deed. The court noted that the 1896 deed was the oldest deed contained in the record, whereas the oldest deed concerning the Thornton property was from 1919 and contained only a bounded description of the property. The court found that the 1919 boundary contained in the Thornton chain of title was the same boundary referenced as the southern boundary of the Conyers property in the 1896 deed. The chancery court also noted that there was no explanation as to why the 1921 deed contained a metes and bounds description of the property "even though [the party who drafted the deed] only received a bounded deed from their predecessor-in-title in 1919." The court explained that this caused Mr. Dodd's method of surveying "to not be as reliable as the method chosen by [T.M.D. Farms's] surveyors in this case."

Additionally, the chancery court made an alternative finding that if Mr. Dodd's survey was accurate, then T.M.D. Farms had adversely possessed the disputed area and was entitled to ownership pursuant to Tennessee Code Annotated section 28-2-105. The chancery court also held that T.M.D. Farms had not proven its claim for damages. The plaintiffs filed this appeal. For the following reasons, we affirm.

## II. ISSUES PRESENTED

The appellants have presented the following issues on appeal, which we have reproduced verbatim:

1. Whether the trial court erred under Tennessee Code Annotated sections 28-2-109 and 28-2-110 by awarding the disputed area to T.M.D. when Plaintiffs paid taxes on same in excess of twenty (20) years.
2. Whether the trial court erred by awarding the disputed area to T.M.D. and failing to give full priority to natural and manmade monuments as required by Tennessee case

law and generally accepted surveying standards.

3. In the alternative, whether the trial court erred by awarding the disputed area to T.M.D. when T.M.D. failed to establish exclusive color of title.

4. Whether the trial court erred in finding T.M.D. to be the owner of the disputed area when, in so doing, the court created a possible cloud of title of adjoining property owners that were not made parties to the litigation as indispensable parties.

For the following reasons, the judgment of the chancery court is affirmed.[6]

## III. DISCUSSION

### A. Standard of Review

As this is a non-jury case, we will review any findings of fact "*de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see Haddad Fam. P'ship v. Pouncey*, No. W2014-01761-COA-R3-CV, 2015 WL 4460864, at *5 (Tenn. Ct. App. July 21, 2015). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *In re Est. of Ladd*, 247 S.W.3d 628, 637 (Tenn. Ct. App. 2007) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). However, "[t]here is no presumption of correctness . . . as to the trial court's legal conclusions." *In re Est. of Fletcher*, 538 S.W.3d 444, 448 (Tenn. 2017). Additionally, "[t]he trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary." *Duke v. Duke*, 563 S.W.3d 885, 894 (Tenn. Ct. App. 2018) (citing *Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)).

### B. Presumption of Ownership Based on Payment of Taxes

The appellants argue that, because they paid taxes on the disputed area for more than 20 years, the terms of Tennessee Code Annotated sections 28-2-109 and 28-2-110 create a presumption of legal ownership in their favor and prohibit T.M.D. Farms from asserting a claim of ownership over the disputed area. They claim that the chancery court's judgment should be reversed for failure to consider the effects of these statutes. Tennessee Code Annotated section 28-2-109 provides that:

---

[6] The appellants also claim that the chancery court's decision to deny summary judgment should be overturned. However, because a full trial has taken place since the entry of the order denying summary judgment, and the issue referenced in the brief was a factual issue, we deem any issue pertaining to summary judgment to have been waived. *See Hobson v. First State Bank*, 777 S.W.2d 24, 32 (Tenn. Ct. App. 1989).

[a]ny person holding any real estate or land of any kind, or any legal or equitable interest therein, who has paid, or who and those through whom such person claims have paid, the state and county taxes on the same for more th[a]n twenty (20) years continuously prior to the date when any question arises in any of the courts of this state concerning the same, and who has had or who and those through whom such person claims have had, such person's deed, conveyance, grant or other assurance of title recorded in the register's office of the county in which the land lies, for such period of more than twenty (20) years, shall be presumed prima facie to be the legal owner of such land.

Tenn. Code Ann. § 28-2-109. Notably, application of Tennessee Code Annotated section 28-2-109 creates only a presumption "that the claimant is the *prima facie* legal owner of the land" but that presumption is rebuttable and "it is controlling only in the absence of contrary facts and circumstances." *White v. Pulaski Elec. Sys.*, No. M2007-01835-COA-R3-CV, 2008 WL 3850525, at *6 (Tenn. Ct. App. Aug. 18, 2008). Additionally, Tennessee Code Annotated section 28-2-110, in relevant part, provides that:

[a]ny person having any claim to real estate or land of any kind, or to any legal or equitable interest therein, the same having been subject to assessment for state and county taxes, who and those through whom such person claims have failed to have the same assessed and to pay any state and county taxes thereon for a period of more than twenty (20) years, shall be forever barred from bringing any action in law or in equity to recover the same, or to recover any rents or profits therefrom in any of the courts of this state.

Tenn. Code Ann. § 28-2-110(a).

The chancery court found that these statutes did not apply because both parties, and their predecessors in interest, had paid taxes on the disputed area for more than 20 years. The court found that, while the tax map generated by the assessor's office and the acreage upon which the plaintiffs paid taxes demonstrated they had paid taxes on the disputed area, this evidence did not prove they had done so to the exclusion of T.M.D. Farms or its predecessors in interest. The chancery court reviewed T.M.D. Farms's property tax records and determined that, as it had been taxed on 73 acres of property in Haywood County, the disputed area was included in the assessment. The court noted that, based on the surveys entered as evidence, if T.M.D. Farms did not own the disputed area it would only own 62 acres of property in Haywood County and, therefore, the evidence demonstrated it "ha[d] implicitly been taxed on that property." The appellants argue that this decision was erroneous because "the proof on which the trial court relied to determine that [T.M.D. Farms] also paid taxes on the Disputed Area [was] insufficient to make that conclusion." They contend that the Haywood County tax map demonstrates they paid tax on the disputed area to the exclusion of all others.

The crux of this issue concerns the chancery court's finding that both parties and their predecessors in interest had paid taxes on the disputed property. The chancery court explained that because the appellees had proven they paid taxes on the disputed area, the appellants had not done so to the exclusion of all others. The court relied on this Court's decision in *Conder v. Salyers*, which provides that, "a party must show that: (1) he or she has a legal or equitable interest in the property; and (2) that he or she has paid taxes on the disputed property *to the exclusion of any other party for twenty years*" to "create" the rebuttable presumption of ownership pursuant to Tennessee Code Annotated section 28-2-109. 421 S.W.3d 589, 596 (Tenn. Ct. App. 2013) (emphasis added). As the statutory presumption is dependent on the determination that the appellants alone have paid taxes on the disputed area, we must review the chancery court's determination that both parties paid taxes on the disputed area for at least 20 years. This is an issue of fact. Therefore, as stated above, we conduct our review *de novo* with a presumption of correctness, and the finding will only be overturned if the evidence preponderates against it. *See In re Est. of Fletcher*, 538 S.W.3d at 448. Having reviewed the record, we find that it does not.

The appellants claim that the submission of their tax records and the tax map was "sufficient to show that taxes have been paid to the exclusion of other parties." They rely on *Jack v. Dillehay* to support this assertion. 194 S.W.3d 441, 450 (Tenn. Ct. App. 2005). This case provides that, "plats from a county assessor's office are admissible for the purposes of determining who paid taxes on a particular piece of property." *Id. Jack* cites *Whitworth v. Hutchinson*, which itself, provides that a trial court did not err when it permitted "plats from the county assessor's office [to be] introduced for the purpose of showing the plats on which the parties had paid taxes[.]" 731 S.W.2d 915, 917 (Tenn. Ct. App. 1986). While both cases demonstrate that maps and records created by a county property assessor are admissible as evidence that a party paid taxes on certain property, these cases do not indicate that tax maps are evidence the taxpayer did so to the exclusion of all others. In *Jack*, the property assessor's map and records were used to demonstrate that the defendants had paid taxes on the property for purposes of an affirmative defense pursuant to Tennessee Code Annotated section 28-2-109. *Jack*, 194 S.W.3d at 451. The opinion does not indicate that this evidence proved the plaintiff did not do so. *Id.* at 452. Rather, the opinion notes that the plaintiff presented "evidence that acreage within the parcels fluctuated," to demonstrate she paid taxes on the property but explains the trial court "did not find this evidence persuasive." *Id.* Essentially, the trial court merely determined that the plaintiff had not proven she paid taxes; it does not appear to have held that the defendants proved that she did not. *Id. See Garabrant v. Chambers*, No. E2021-00128-COA-R3-CV, 2022 WL 289550, at *9 (Tenn. Ct. App. Feb. 1, 2022) (stating that while the plaintiff had demonstrated he paid taxes on parcels assessed to him, the defendants "had also paid taxes on their parcels, which they believed to contain the disputed property" and therefore, the court did not err when it determined "the presumption of ownership provided in Tennessee Code Annotated § 28-2-109 had been rebutted"). Likewise, this Court has previously considered evidence other than or in addition to tax

maps to determine who paid taxes on real property. *See Trantham ex rel. Hartsell v. Lynn*, No. E2011-02611-COA-R3-CV, 2014 WL 931229, at \*7 (Tenn. Ct. App. Mar. 11, 2014) (explaining that a trial court "placed some weight on [a] tax map" but also considered "the entirety of the evidence in making its decision" as to whether the presumption of Tennessee Code Annotated section 28-2-109 arose); *Elliott v. Morrow*, No. E2013-00692-COA-R3-CV, 2013 WL 6909424, at \*10 (Tenn. Ct. App. Dec. 23, 2013) (noting that the a trial court considered tax cards and tax receipts demonstrating changes to the total acreage upon which parties were taxed as evidence of who paid taxes on certain property); *Conder*, 421 S.W.3d at 596-97 (stating that "the testimonies of [two witnesses]" were used along with tax receipts to establish the plaintiffs had paid property taxes on a disputed tract of land for the statutory period). Therefore, while tax maps and records are certainly strong evidence that a particular party paid taxes on certain property, we do not find they are incontrovertible to show that such payment was to the exclusion of all others where other evidence indicates otherwise.

Turning to the present circumstances, when determining whether T.M.D. Farms paid taxes on the disputed area, the chancery court considered the property assessor's records and the surveys of both parties. The court found that evidence of acreage upon which T.M.D. Farms paid taxes to be persuasive. The court noted that the property assessor's records reflect T.M.D. Farms and its predecessors in interest have been taxed on 73 acres of property in Haywood County for more than 20 years. This is supported by the property tax card for the T.M.D. property, and additional records demonstrate that T.M.D. Farms has been taxed on 27 acres of property located in Crockett County. When comparing the amount of acreage assessed with the surveys provided, the chancery court determined that, to have paid taxes on 73 acres in Haywood County, the 11.28 acres contained in the disputed area must have been included in the assessment. The chancery court compared T.M.D. Farms's tax records and the various property surveys to generate this conclusion. Accordingly, the chancery court determined that T.M.D. Farms paid taxes on the disputed area. The chancery court essentially held that there had been an "overlap" and double taxation, which Ms. Harwell testified does occur. Having reviewed the record, we cannot say that the evidence preponderates against the chancery court's finding that both parties paid taxes on the disputed area. Accordingly, we affirm the chancery court's finding that both parties paid taxes on the disputed area for more than 20 years, and its determination that the presumption of Tennessee Code Annotated section 28-2-109 did not arise. Likewise, even if this presumption had been created when the appellants submitted evidence demonstrating they paid taxes on the property for 20 years, this presumption would have been rebutted by the evidence submitted by T.M.D. Farms. *See Garabrant*, 2022 WL 289550, at \*9.

As stated above, the appellants also claim that the terms of Tennessee Code Annotated section 28-2-110 prohibited T.M.D. Farms from claiming the tax map of the assessor's office was incorrect. *See Tidwell v. Van Deventer*, 686 S.W.2d 899, 903 (Tenn. Ct. App. 1984). However, as we have determined that the evidence did not preponderate

against the chancery court's finding that both parties paid taxes on the disputed area during the preceding 20 years, we find this issue to be without merit.

## C. Competing Surveys

The appellants also argue that the chancery court erred when it adopted the Richardson and Maness surveys as the accurate representation of the boundary line in dispute. The appellants argue that the chancery court failed to properly consider "the hierarchy of markers as required by Tennessee case law and generally accepted surveying standards." They claim that Mr. Dodd's reliance on the Forked Deer River and use of preexisting artificial markers renders his survey more reliable than those of Mr. Richardson and Mr. Maness. *See Wood v. Starko*, 197 S.W.3d 255, 260 (Tenn. Ct. App. 2006). They note that Mr. Richardson used the deed of an adjacent tract of land to locate the northeast corner of the T.M.D. property and acknowledged that there were no natural or manmade monuments located where he determined the corner was located. Likewise, they claim the road that Mr. Richardson relied on when completing his survey is not reliable as it does not directly border either the Thornton property or the T.M.D. property.

"In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all of the evidence and assess the credibility of the witnesses." *Mix v. Miller*, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999). "The judgment of the trial court should be affirmed, absent errors of law, unless the preponderance of the evidence is against those findings." *Hong v. Foust*, No. E2011-00138-COA-R3-CV, 2012 WL 388448, at *5 (Tenn. Ct. App. Feb. 8, 2012). As this Court has previously explained, "[i]n determining disputed boundaries, resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances." *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980). A trial court's determinations regarding witness credibility are typically "entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary." *Duke*, 563 S.W.3d at 894. "This deferential standard specifically applies in a boundary dispute where a trial court must choose between two competing surveys." *Bridgewater v. Adamczyk*, 421 S.W.3d 617, 628 (Tenn. Ct. App. 2013). *See e.g. Galloway v. Scott*, No. E2023-01666-COA-R3-CV, 2025 WL 294498, at *9 (Tenn. Ct. App. Jan. 24, 2025) (declining to disturb a trial court's holding regarding the determination of a boundary line where the court "explained in detail its reasoning for giving more credence to [one surveyor's] testimony and survey"); *Bridgewater*, 421 S.W.3d at 628 (finding no error in the trial court's choice between competing surveys "[i]n light of the great deference" given to the trial court's decision and where the record demonstrated "that the trial court thoroughly considered each of the surveyors' methods and conclusions"); *Hong*, 2012 WL 388448, at *5 (explaining that "[d]ue to the fact-intensive nature of boundary line disputes" a trial court's "credibility determinations are binding on this court unless the evidence preponderates against them" and where a trial court accepts "one surveyor's findings over that of another, that same deference requires

this court to accept the trial court's findings"). Importantly, where boundary lines "'are on the face of the earth is a question of fact'" and, therefore, a trial court's "finding as to the true location of the parties's [sic] common boundary line . . . is entitled to the presumption of correctness." *Conder*, 421 S.W.3d at 592-93 (quoting *Hong*, 2012 WL 388448 at *5).

Notably, the chancery court found that each of the surveyors was honest and all mathematical measurements and calculations were correct. Nevertheless, the chancery court explained its reasoning for adopting the Richardson and Maness surveys. The chancery court noted that the Richardson and Maness surveys relied on a deed contained in the T.M.D. property's chain of title that was drafted in 1896. The court explained that this was the oldest deed contained in the record and contained a metes and bounds description to which the Richardson and Maness surveys conformed. The court also found that it was "proper" for the surveyors to use Johnson Grove Road to locate the northeastern corner of the T.M.D. Property. This Court has previously permitted the use of roads as artificial monuments. *See Scarbrough v. Isham*, 196 S.W.2d 73, 75 (Tenn. Ct. App. 1946) (holding that "in this case the [road] is to be treated as an artificial monument"). Likewise, the chancery court noted that it gave weight to the testimonies of Mr. Richardson and Mr. Maness, who both "testified that they relied on evidence other than merely that singular deed call to locate the northeast corner of [the T.M.D. property]." Mr. Richardson testified that he used GPS technology to make his calls, and both surveyors testified they relied on various artificial markers and deeds of the T.M.D. property and adjacent properties.

The chancery court also explained why it found the Dodd survey to be less reliable. The court noted that the oldest deed contained in the Thornton property's chain of title was from 1919 and contains a bounded description of the property. This deed describes the northern boundary of the Thornton property by relying on the southern boundary of the Conyers property, which is now the T.M.D. property. The chancery court explained that the metes and bounds description contained in the 1921 deed did not comport with the bounded deed, and this deed "inexplicably alter[ed] the legal description of [the Thornton property] from its 1919 deed" and this caused "[Mr.] Dodd's method to not be as reliable as the method chosen by [Mr. Richardson and Mr. Maness]." The appellants take great issue with the court's decision to adopt the Richardson and Maness surveys despite the Dodd survey's reliance on the location of the Forked Deer River, which they argue constitutes a natural monument, and several artificial monuments.[7] However, the chancery court clearly gave weight to the fact that the natural monument Mr. Dodd referenced in his survey was not referenced or in existence when the initial deeds on these properties were executed. Additionally, Mr. Maness testified that this change "from a bounded deed to a calls deed back to a bounded deed" weighed on his decisions while conducting his survey. Therefore, while the court determined that Mr. Dodd's decision to rely on the location of the Forked Deer River was proper, his overall method was deemed to "not be as reliable" because of the alterations contained in the chain of title, not the location of the monument

---

[7] As stated earlier, although the Forked Deere River is called such, it is actually a man-made canal.

itself. Therefore, we discern no error in the chancery court's decision to deem the Dodd survey less reliable.

The chancery court weighed the testimony of each of the surveyors and considered the additional evidence contained in the record when it determined that the boundary line shared by the Thornton property and T.M.D. property was represented by the Richardson and Maness surveys. The court also made this decision after examining the survey maps with the surveyors and was able to observe first-hand "their physical instructions with regard to the maps." *Haddad Fam. P'ship*, 2015 WL 4460864, at *6. The court deemed the Richardson and Maness surveys more reliable than the Dodd survey based on: (1) the T.M.D. property's chain of title containing a deed older than any contained in the Thornton property's chain of title, (2) the legal descriptions of the deeds in the Thornton property's chain of title changing from a bounded description, to a metes and bounds description, back to a bounded description, and (3) the testimonies of Mr. Richardson and Mr. Maness that they relied on evidence beyond a single deed call in establishing the point of beginning for their surveys. Given the great weight we give to a trial court's decision between competing surveys and the absence of evidence preponderating against the court's findings of fact, the ruling of the chancery court is affirmed. *See Bridgewater*, 421 S.W.3d at 628.

### D. Alternative Finding of Adverse Possession

The chancery court included an alternative finding in its final order. The court stated that, should this Court "disagree with [its] ruling with regard to the boundaries of the disputed tract as set forth above, the Court alternatively finds that [T.M.D. Farms] has adversely possessed the disputed property[.]" *See* Tenn. Code Ann. § 28-2-105. As we affirmed the chancery court's decision to adopt the surveys of Mr. Richardson and Mr. Maness as representative of the boundary line in this case, this issue is pretermitted.

### E. Joinder of Necessary Parties

The appellants also argue that the chancery court's judgment "created a possible cloud of title of adjoining property owners that were not made parties to the litigation as indispensable parties." They claim that, pursuant to Tennessee Rule of Civil Procedure 19.01, failure to add those parties left the chancery court unable to enter a valid judgment. *See Roberts v. England*, No. M1999-02688-COA-R3-CV, 2001 WL 575560, at *3 (Tenn. Ct. App. May 30, 2001). They claim that the chancery court's judgment should be vacated and the case remanded. Tennessee Rule of Civil Procedure 19.01 provides that:

> [a] person who is subject to service of process shall be joined as a party if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to

protect that interest, or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person properly should join as a plaintiff but refuses to do so, he or she may be made a defendant, or in a proper case, an involuntary plaintiff.

Tenn. R. Civ. P. 19.01. The appellants appear to make their arguments pursuant to part (2) of this rule. They claim that the property interests of the owners of adjacent tracts may be altered if the Thornton property contains 104 acres but does not contain the disputed area. Notably, despite being the plaintiffs in this matter, the appellants neither attempted to add these parties nor brought the issue before the chancery court during the trial. As we have previously stated, this "issue cannot be held as the proverbial 'ace in the hole' to be played on appeal." *Adkins v. Bluegrass Ests., Inc.*, 360 S.W.3d 404, 415 (Tenn. Ct. App. 2011) (quoting *Griswold v. Income Properties, II*, 880 S.W.2d 672, 678 (Tenn. Ct. App. 1993)). The appellants' "failure to call the issue to the attention of the [chancery] court constitutes a waiver of the issue." *Id.* (citing *Griswold*, 880 S.W.2d at 678).

Additionally, the scope of this action was limited to establishing the boundary line between the Thornton property and the T.M.D. property. The only relief pertaining to the actual location of a boundary line set forth in the appellants' complaint was a request that the court declare T.M.D. Farms's claim of ownership to be "erroneous." This relief does not implicate the adjacent property owners. Moreover, the chancery court's final order does not make any implicit or explicit findings of fact pertaining to the boundary lines of those adjacent properties or of the boundaries of the Thornton property beyond its shared boundary with the T.M.D. property. The final order in this matter states only "that the boundaries of [the T.M.D. property] are as set forth in the Richardson and Maness surveys[.]" The ruling maintains the status quo as to the T.M.D. property and does not opine as to any extension of the Thornton property's other boundary lines. We have previously held that, where a trial court's judgment contained no findings with respect to boundaries "other than the one between the plaintiff's and the defendant's property," it was not necessary to add additional parties for the judgment to be valid. *Brummitte v. Lawson*, 182 S.W.3d 320, 323-24 (Tenn. Ct. App. 2005). Therefore, we discern no error in the chancery court's decision to rule on this matter without the joinder of these parties.

## IV. CONCLUSION

For the foregoing reasons, the ruling of the chancery court is affirmed. Costs of this appeal are taxed to the appellants, Taylor Thornton, III, and Carter Edwards, for which execution may issue if necessary.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE